[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Hundley*, Slip Opinion No. 2020-Ohio-3775.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-3775

THE STATE OF OHIO, APPELLEE, *v.* HUNDLEY, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Hundley*, Slip Opinion No. 2020-Ohio-3775.]**

*Criminal law—Aggravated murder—Death penalty—Sufficiency of the evidence—Manifest weight of the evidence—Appropriateness and proportionality of death penalty—Death penalty affirmed.*

(No. 2018-0901—Submitted February 12, 2020—Decided July 22, 2020.)

APPEAL from the Court of Common Pleas of Mahoning County,

No. 2015 CR 1132.

_____

KENNEDY, J.

{¶ 1} On November 6, 2015, appellant, Lance Hundley, murdered Erika Huff and attempted to murder her mother, Mrs. Denise Johnson.  After a trial, a Mahoning County jury convicted him of aggravated murder with a course-of-conduct specification, attempted murder, felonious assault, and two counts of aggravated arson.  Following the jury's recommendation, the trial court sentenced Hundley to death on the aggravated-murder count.

{¶ 2} We now review Hundley's direct appeal of right and, for the following reasons, affirm his convictions and sentence of death.

## I. BACKGROUND

### A. Hundley moves in with Huff

{¶ 3} Huff lived at 44 Cleveland Street in Youngstown, Ohio. She had a progressive form of multiple sclerosis and could no longer walk. She was entirely dependent on a wheelchair, and a Hoyer lift was used to transfer her from her bed to the wheelchair. Huff received daily care and assistance from nurse aides employed by Comfort Keepers. The nurse aides would assist Huff with the daily chores such as cooking and cleaning, getting in and out of bed, and getting dressed and undressed. She also wore a medical-alert necklace that was monitored by Guardian Medical. If the alert was activated, Guardian would call Huff's mother, Mrs. Johnson. An ambulance would also be dispatched to the address provided by Guardian.

{¶ 4} Huff's house at 44 Cleveland Street was one story with an attached garage. The front door was in the center of the house and opened into the front room. To the left of the door was a living area and to the right, a dining area. The dining area contained a large oval table. A hallway from the front room led to the back of the house. The kitchen was behind the dining area, with an entrance off the right-side of the hallway. At the end of the kitchen, opposite the entrance, was a door that led to the attached garage. Continuing down the hallway, at the end on the left, was Huff's bedroom. And to the right, across from Huff's bedroom, was a spare room in which the back door was located.

{¶ 5} In the summer of 2015, Hundley moved from Washington, D.C., to Youngstown. Huff, who had a daughter with Hundley's brother, offered him a room in her house at 44 Cleveland Street sometime in the fall. According to Mrs. Johnson, Hundley had been living in Huff's house for approximately three to four weeks by early November. Mrs. Johnson was asked by the prosecutor whether the

relationship between Huff and Hundley had become strained, however, the court sustained an objection to the question. The prosecutor then inquired of Mrs. Johnson whether Huff and Hundley were getting along. She testified that they got along but that their relationship was strained.

{¶ 6} According to A'Shawntay Heard, a nurse aide who had cared for Huff for years, Huff's demeanor changed after Hundley moved in, especially when he was around. Heard testified that Hundley was a controlling person and Huff would hold "a lot of stuff in" and not be as open as she had previously been. When Hundley would leave the house, Huff would say things to Heard, including that "she was just fed up with everything." Heard testified that she felt very uncomfortable when Hundley was at the house. She also said that Huff had lost caregivers because of Hundley.

### B. Events of November 5 and 6, 2015

#### 1. Huff's medical alert

{¶ 7} Heard was on duty at Huff's house on November 5, 2015. She worked a four-hour shift that ended at 10:00 or 11:00 p.m. Heard testified that she completed the typical evening-shift tasks and helped Huff get into bed. She made sure that Huff had access to her cell phone, snacks, and a grabbing aid. At Huff's request, Heard tucked the cash Huff had received from her monthly disability check underneath her thighs, between the bedsheet and Huff's body. Heard testified that the grabbing aid was not bent when she left the house that evening.

{¶ 8} According to Heard, Hundley was in and out of the house all evening. She testified, "I was in the kitchen cooking for [Huff] * * * he was * * * making me feel uncomfortable, coming towards me. I had asked him please back away from me. And he did back away from me once I asked him. Like, he's trying to just hit on me." Hundley told Heard that he "needed some type of mental help and he wasn't from the area." Heard gave him the name of a local counseling center.

{¶ 9} Just before she left the house, Heard gave Huff her personal cell-phone number. This was against company policy, but Heard said that she gave Huff her number because Heard "had felt that whole day [that] something just wasn't right or something was going to happen." She felt uncomfortable because Hundley "was in the home * * * that night and he was drinking." When Heard left, Hundley was not there.

{¶ 10} At 2:01 a.m. on November 6, Huff's medical-alert necklace was activated and an ambulance was dispatched to 44 Cleveland Street. Brittany Koch and her partner, licensed emergency medical technicians ("EMTs"), received a dispatch for an "unknown medical alarm." Koch testified that they received an address but no further information, such as a name, gender, or age. When they arrived at 44 Cleveland Street, they noted that there was one light-colored car in the driveway and the lights were on behind the drawn blinds; they knocked on the front door and identified themselves. Initially nobody responded, so the EMTs knocked on doors and windows. Still receiving no response, Koch attempted to open the front door, but it was locked.

{¶ 11} The EMTs had been at the house a couple of minutes and were preparing to check the back of the house when a tall African-American man—who was later identified by Koch as Hundley—opened the front door. Koch testified that the man was wearing a red hat and a dark hooded sweatshirt. The man told her that he had accidentally triggered the medical alarm and nothing was wrong. Under the belief that the man was the patient, Koch and her partner told him to call back if he needed help. According to Koch, the man was calm and polite and did not seem anxious.

### 2. Hundley attacks Mrs. Johnson

{¶ 12} Shortly after the activation of Huff's medical alert, Guardian called Mrs. Johnson. Mrs. Johnson testified that she got to Huff's house no more than ten minutes after receiving the call. Mrs. Johnson parked in the driveway behind a

white car that she did not recognize. She also stated she did not see an ambulance. As she unlocked the front door, she noted that the top lock was locked, which was unusual because it was the practice of the nurse aides to lock only the bottom lock.

{¶ 13} Mrs. Johnson entered the house and found Hundley standing inside with a gasoline can. She smelled gas, and when she asked Hundley where Huff was, he said that she was in the back. Mrs. Johnson told Hundley that she was there to check on Huff and to let first responders in because the medical-alert necklace had been activated. Hundley told Mrs. Johnson that the first responders had already gone. Mrs. Johnson then picked up the gasoline can, which Hundley had set on the floor, and took it to the attached garage through a door in the kitchen.

{¶ 14} When Mrs. Johnson reentered the kitchen, Hundley attacked her. Hundley pinned Mrs. Johnson between the refrigerator and the door to the garage and began to hit her on the head with a hammer. Mrs. Johnson testified that during the attack, Hundley told her he had killed Huff and would also kill her and Huff's brother. When Mrs. Johnson asked why, Hundley told her that Huff "wanted to have sex with [him] and she was disrespecting [his] brother." Hundley also expressed to Mrs. Johnson his belief that Huff and her family just "weren't into him." At one point, Mrs. Johnson told Hundley to stop and reached for him, but Hundley admonished her to not "touch [him] with those bloody hands and get [his] white $150 shirt all dirty." Mrs. Johnson testified that the shirt was white, and it had "some kind of emblem on it or something."

{¶ 15} Hundley continued to beat Mrs. Johnson with the hammer. But he then grabbed a kitchen knife and held it to Mrs. Johnson's face while choking her and dragging her through the house. Mrs. Johnson lost consciousness.

{¶ 16} When Mrs. Johnson regained consciousness, she was lying on the floor of Huff's bedroom next to her daughter. Mrs. Johnson saw flames burning at her feet and around Huff's body. Mrs. Johnson sat up and tried to brush the fire away from her feet and from Huff. But Hundley saw Mrs. Johnson moving around,

so he returned to the bedroom, took Huff's grabbing aid, and tried to hit Mrs. Johnson with it to force her to stay down. Mrs. Johnson was able to take the tool away from Hundley, who then retrieved some alcohol and splashed it on her face. Not knowing where Hundley had gone, Mrs. Johnson crawled to a window. As the room filled with smoke, Mrs. Johnson attempted to escape through the window by dislodging an air-conditioning unit.

### 3. Rescue of Mrs. Johnson and discovery of Huff's body

{¶ 17} Mrs. Johnson's husband, Lonnie Johnson, was concerned when Mrs. Johnson did not return from Huff's home. He drove to Huff's house and was surprised to find the front door was locked because it was never locked. He heard a "wrestling" noise coming from inside the house and thought he heard Mrs. Johnson say something like "get out of here." At 2:56 a.m., Mr. Johnson called 9-1-1.

{¶ 18} Youngstown Police Officers Michael David Medvec Jr. and Ken Bielik arrived at the scene at 3:06 a.m. They spoke to Mr. Johnson and then walked around the perimeter of the house twice looking for signs of a burglary. They found no signs of illegal entry. As the officers were about to unlock the front door (using Mr. Johnson's key), the officers heard a "scuffling noise * * * like something[ was] being pulled towards the back of the house." They immediately ran to the back.

{¶ 19} A third Youngstown Police officer, Timothy Edwards, joined Officers Medvec and Bielik. As the three officers reached the back of the house, they heard "the air conditioner being rattled" and then realized that the room was on fire. They heard pounding on the window and screams for help. Once they had pulled Mrs. Johnson to safety, Officer Medvec could see into the bedroom and noticed a body, partially clothed, lying on the floor and on fire. He testified that the person appeared to be dead.

{¶ 20} Officer Edwards saw the back door open and a taller black male with a bald head look around. According to Officer Edwards, upon seeing the officers,

the man "immediately closed the door and stepped back inside." Officer Medvec also testified that he "saw a hand, what was clearly a man's hand, pull the door back shut."

{¶ 21} Officers Medvec and Edwards entered the house three times, but twice had to retreat because of heavy smoke. Officer Medvec testified that there was no evidence of a break-in or burglary. They found Huff's body face up on her bedroom floor. The body was clothed only in underwear, a gasoline-soaked shirt, and socks.

{¶ 22} The third time the officers entered the house, they went through the front door and found Hundley. He was lying on the floor, by his gym bag, in close proximity to the front door, halfway underneath the dining-room table. Officer Medvec testified that neither officer had seen him or anyone else the two previous times they had entered the house. When he was taken out of the house, Hundley was motionless but uninjured and free from soot or other debris from the fire. Both Officer Edwards and Detective Sergeant Anthony Vitullo, who arrived on the scene shortly after Officers Medvec, Edwards, and Bielik, testified that they did not observe any injuries or visible marks on Hundley.

{¶ 23} After Mrs. Johnson identified her attacker to an investigating officer, Hundley was the sole suspect in Huff's death. Ambulances took Hundley and Mrs. Johnson to St. Elizabeth Youngstown Hospital. Officer Bielik accompanied Hundley to the hospital.

### 4. Huff's autopsy

{¶ 24} Dr. Joseph Ohr, a deputy coroner for Mahoning County, conducted Huff's autopsy. But because Dr. Ohr died before Hundley's trial, Dr. Joseph Felo, the deputy medical examiner for Cuyahoga County, testified as a substitute witness. Dr. Felo reviewed Huff's autopsy report, toxicology report, medical history, and photographs from the scene and the autopsy.

**{¶ 25}** Referring to the autopsy report, Dr. Felo explained that Huff died from "two mechanisms"—blunt trauma of her head, face, chest, and abdomen in conjunction with ligature strangulation—and her death was not instantaneous. Dr. Felo also stated that because there was no sign of smoke or soot in her nostrils or her airways down to the lungs, the fire began after Huff's death.

**{¶ 26}** Dr. Felo testified that Huff suffered blunt-force trauma while she was still alive, resulting in significant bruising and facial and head lacerations, but that the impacts on her body were not immediately fatal. However, Dr. Felo noted that Huff had been struck with enough force to tear a major vein that supplies or collects blood from the intestines, leading to "massive internal bleeding around the belly." The internal bleeding would have made Huff "shocky and somewhat weaker during her dying process."

**{¶ 27}** The blunt-force trauma contributed to Huff's death, according to Dr. Felo, in conjunction with the strangulation. Dr. Felo noted that there was evidence of petechial hemorrhages on the whites of Huff's eyes, which indicated strangulation. He also noted that a black cord around Huff's neck "was tight enough to leave an impression."

**{¶ 28}** Dr. Felo testified that the bruising from the blunt-force trauma occurred before the strangulation. Additionally, he explained that the amount of blood that had accumulated in Huff's body and the bruising that had developed indicated that "the beating t[ook] a while."

**{¶ 29}** The autopsy revealed many other nonlethal injuries. Huff had been beaten severely on her face and head, resulting in multiple significant bruises and cuts. Her body showed evidence of blunt impacts to the trunk and extremities, including rib fractures, the massive internal bleeding, and bruising and lacerations on the front and back of her upper arms and on her chest. She had several defensive wounds on her forearms and hands.

{¶ 30} Dr. Felo also noted areas on Huff's body where her skin had sloughed off or slipped away as a result of gasoline being poured on her body. He also pointed out an area of brown discoloration on Huff's side, which he said was indicative of a "thermal injury from her body being set on fire after she died and there's some charring of the skin." Dr. Felo testified, to a reasonable degree of medical certainty, that Huff was already dead when the fire occurred.

### 5. Mrs. Johnson's injuries

{¶ 31} Mrs. Johnson arrived at St. Elizabeth's emergency room at 3:38 a.m. on November 6. Cortney Birchak, a registered nurse who treated Mrs. Johnson later in the morning, testified that Mrs. Johnson had "sustained significant * * * multiple head injuries from a hammer." Birchak saw multiple lacerations and areas of stapling and bruising on Mrs. Johnson's face. There was swelling on her face. According to Birchak, Mrs. Johnson was in such severe pain that Birchak could not completely clean the dried blood off Mrs. Johnson's face and hands. Mrs. Johnson's hospital records indicate that she also suffered a concussion with loss of consciousness and a fracture to her left hand.

### 6. Hundley's arrest

{¶ 32} Detective Sergeant Ronald Rodway of the Youngstown Police Department arrived at the crime scene after Hundley and Mrs. Johnson had been taken to the hospital. Detective Rodway walked through the house and then spoke to fire-department personnel and arson investigators. Next, Detective Rodway and his partner went to the hospital hoping to talk to Mrs. Johnson.

{¶ 33} When Detective Rodway arrived at the hospital, EMT Koch was in the emergency room on another emergency call. Rodway asked EMT Koch if she recognized the patient in one of the trauma bays. EMT Koch said yes and confirmed that he was the man who had opened the door at the house at 44 Cleveland Street on the EMTs' earlier run to that address.

{¶ 34} Detective Rodway eventually spoke with Mrs. Johnson, who identified Hundley as her attacker. Hundley was discharged from the hospital into police custody around 2:00 p.m. on November 6, 2015. He initially waived his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and voluntarily talked to detectives. At the start of the interview, Hundley was focused on papers in front of him, and detectives had to ask him to put the documents aside while they spoke. Before the detectives asked any questions about Huff's death and the attack on Mrs. Johnson, Hundley asked, "What do you all think is going on?"

{¶ 35} Hundley told investigators that he had known Huff for approximately eight years, that they had a good relationship, and that he had been living at Huff's house for about a month. Hundley also said that he was in and out of the house on Thursday night. He said that he had been at the Southern Tavern and acknowledged that he had had one shot of Ciroc and a beer but denied that he had been intoxicated. When asked whether Huff was awake or sleeping when Hundley returned from the bar, Hundley said, "[T]his here is where it gets tricky."

{¶ 36} At this point, Hundley asked the detectives whether he was under arrest (they said yes) and then said that he had "kind of figured out something from police officers. Erika died?" Hundley then invoked his right to counsel. However, Hundley volunteered that he had been "choked out" by a stranger who broke into Huff's house early Friday morning. Then, after the investigators confirmed he wanted counsel, Hundley said: "That's it. You all [are] detectives, you all do your jobs. * * * I'm arrested for murder apparently."

### C. Evidentiary analysis

### 1. DNA testing

{¶ 37} The Ohio Bureau of Criminal Investigation ("BCI") received DNA standards from Huff, Mrs. Johnson, and Hundley, and a forensic scientist took cuttings from each swab for testing against evidence obtained from the crime scene.

10

{¶ 38} BCI conducted DNA testing on swabs from the claw, the head, and the handle of the hammer used to attack Mrs. Johnson. The hammer handle contained a mixture of DNA contributions, with Mrs. Johnson as a major contributor. The claw and head also contained Mrs. Johnson's DNA profile. BCI forensic scientist David Miller explained to the jury that an item containing a large amount of one person's DNA may also contain a small amount of another person's DNA, which might be drowned out by the larger contribution. Further Y-STR testing (which looks only at the Y chromosome along a DNA strand) on the hammer's handle revealed some male DNA, but there was not a sufficient amount of DNA for comparison.

{¶ 39} BCI also tested blood samples from the handle of Huff's grabbing aid, which was bent when it was collected from the house. The handle yielded a Y-STR profile consistent with Hundley, with a frequency of 1 in 621 unrelated males. The grab end and the black discs at the grab end each yielded a single profile that was consistent with Mrs. Johnson. The frequency of the profile was 1 in 1 sextillion 282 quintillion for all three locations.

{¶ 40} BCI also tested the bloody white Hilfiger polo shirt that Hundley had been wearing. The polo shirt had "YACHT CLUB New York" on the front upper-right side and a large crest with HILFIGER underneath the crest on the front upper-left side. The polo shirt was found in Hundley's gym bag in the dining area near the front door of the house.

{¶ 41} The inside collar of the polo shirt yielded a mixture of profiles, and BCI could not exclude Hundley or Mrs. Johnson as possible contributors. The statistic for that mixture of profiles was 1 in 4,307,000. Assuming random testing, this result means that BCI would test "around 4 million people before [it] would find someone who could * * * fit into that mixture of DNA profiles." Two other stains on Hundley's polo shirt contained a profile consistent with Mrs. Johnson, to an expected frequency of 1 in 1 sextillion 282 quintillion.

{¶ 42} DNA testing of Huff's fingernail clippings yielded a mixture of profiles including Huff's and Hundley's. STR testing, another form of DNA testing, found a profile consistent with Hundley to an expected frequency of 1 in 300,000, and Y-STR testing confirmed that he was a contributor.

### 2. Arson investigation

{¶ 43} Brian Peterman, an investigator from the State Fire Marshal's office, examined 44 Cleveland Street on November 6, 2015. He arrived shortly after 6 a.m. Peterman found minimal damage outside the house, mainly minor smoke staining around the window from which the air-conditioning unit had been removed. A strong odor of gasoline was still present when he entered the house. After examining the inside of the house, Peterman concluded that the fire had originated in Huff's bedroom. He found an irregular burn pattern that began on Huff's bed and "continued down from the bed onto the floor in an irregular shape."

{¶ 44} While sorting through the fire debris, fire investigators collected a metal knife blade, clothing, a cigarette lighter, a swatch of carpet from the floor near Huff's bed, and other debris. Peterman also collected a gasoline can that he found in the garage. The coroner's office provided Peterman with the t-shirt that Huff had been wearing, and Youngstown police also provided him with the other clothes taken from the house, which included Hundley's white Hilfiger polo shirt and white t-shirt.

{¶ 45} Christa Rajendram, Ph.D., the forensic-laboratory supervisor at the State Fire Marshal's office, identified 13 items that were tested, including items that Peterman had collected from the house and items collected by the coroner and the police. Dr. Rajendram testified to a reasonable degree of scientific certainty that gasoline was detected on every item. Hundley's white Hilfiger polo shirt and white t-shirt also tested positive for chloroform.

## D. Defense case

{¶ 46} The defense presented testimony from two witnesses. Hundley testified that Huff had been his brother's former girlfriend and he had known her for about eight years  After moving to Youngstown from Washington, D.C., Hundley stated he initially lived with his brother. However, that living arrangement became crowded and Hundley asked Huff if he could stay with her.

{¶ 47} Hundley testified that Huff was in a wheelchair and that he had been in her bedroom a couple times when the nurse aide used the Hoyer lift to move Huff. Hundley explained that a Hoyer lift is used to transfer a person who is paralyzed or unable to move from a bed to a wheelchair or stretcher.

{¶ 48} Hundley then testified to the events of November 5, 2015. He said he returned to Huff's house around 8:00 p.m. after being at his cousin's house and stopping at a nearby convenience store to buy two 24-ounce beers. According to Hundley, he and Huff chatted until around 9:00 or 9:30 p.m., when Heard put Huff to bed. He smoked a "blunt of marijuana" with Huff before she went to bed. Around 9:30 or 10:00 p.m., Hundley went to a nearby bar until 11:00 or 11:30 p.m., when he returned to Huff's house. Hundley testified that when he returned, Huff was still awake so he went into her room and talked for a while.

{¶ 49} Hundley claimed he then went to the living room and fell asleep on the couch. He testified that the next thing he remembered "was being woke up with somebody strangling [him] out from behind." He said that he blacked out and woke up on the kitchen floor. Hundley got up and walked toward the back of the house, by Huff's bedroom. Hundley testified that at that point, he saw a dark-skinned, African-American male about Hundley's height leave Huff's bedroom carrying a gas can.

{¶ 50} Hundley checked on Huff only to find that she was on fire; he was not sure that she had a pulse. At that point, Mrs. Johnson entered the front door. Before he realized who was at the door, Hundley grabbed the hammer from a

kitchen drawer. Hundley said that he had a knife in his other hand, but that he dropped both the hammer and knife on a table when he saw Mrs. Johnson. According to Hundley, he saw Mr. Johnson's truck parked behind Mrs. Johnson's car in the driveway and the intruder was sitting in the truck's passenger seat. Hundley testified that Mrs. Johnson had a gas can in her hand and that she told him, "Lance, it's not too late. We can come up with something to tell the police." Mrs. Johnson tried to get Hundley to sit on the couch, but he began to hit her with the hammer because he "didn't know what she was going to do from that point." In the struggle, Mrs. Johnson and Hundley ended up on the floor of Huff's room until Hundley kicked her to get away.

{¶ 51} Hundley decided to leave through the back door. But when he saw Mr. Johnson and two other individuals that he did not recognize, he quickly closed and locked the back door. Hundley testified that he then changed out of the white Hilfiger polo shirt and t-shirt he was wearing and put them in his gym bag, which he dropped on the dining room floor. The next thing he remembered was waking up after having passed out. Hundley said he also passed out in the ambulance.

{¶ 52} On cross-examination, Hundley denied answering the door to Koch around 2:00 a.m. Hundley testified that he had never seen Koch until she testified in his trial and that the man she described was the same person that he had just described that he had seen. He also admitted that he did not give the police the details of his version of events, including his claim that Mr. and Mrs. Johnson conspired to murder Huff.

{¶ 53} The defense also introduced expert testimony from Dr. Alfred Elsworth Staubus, an emeritus faculty member at the Ohio State University College of Pharmacy, to suggest that someone used chloroform to incapacitate Hundley on November 6. Dr. Staubus testified about "the use of chloroform to temporarily incapacitate a person." He explained that although Hundley's toxicology report from November 6, 2015, did not note the presence of chloroform, hospitals do not

test for it. He also noted that Hundley's blood-alcohol level was .105, which is above the legal limit for driving of .080. According to Dr. Staubus, .105 is not a particularly high blood-alcohol level and would not have rendered Hundley unconscious. Dr. Staubus averred that chloroform begins in liquid state but is so volatile that it immediately vaporizes and emits aerosol fumes. He testified that it would not be inconsistent for chloroform to be present on clothing worn by an individual who is using it or by the person against whom the chloroform was administered. However, Dr. Staubus testified that holding a rag soaked in chloroform over the nose and mouth of a person can cause incapacitation.

## II. PROCEDURAL HISTORY AND SENTENCING

{¶ 54} A grand jury indicted Hundley on five counts. Count One charged Hundley with aggravated murder with prior calculation and design (R.C. 2903.01(A)), Count Two charged him with attempted murder (R.C. 2903.02/2923.02(A)), Count Three charged him with felonious assault (R.C. 2911.02(A)(1)(d)), and Counts Four and Five charged him with aggravated arson (R.C. 2909.02(A)). The aggravated-murder count included one death-penalty specification under R.C. 2929.04(A)(5), which alleged that Hundley had committed the murder of Huff as part of a course of conduct involving the purposeful killing of or attempt to kill two or more individuals.

{¶ 55} He pleaded not guilty to all counts, including the capital specification, and the case was tried before a jury. The court denied Hundley's motion for acquittal following the state's case and his renewed request for acquittal before submitting the case to the jury. Within four hours, the jury returned guilty verdicts on all counts and the capital specification.

{¶ 56} The court granted Hundley's oral motion to represent himself for purposes of mitigation, and the mitigation hearing was held on May 30, 2015. The state offered into evidence all the exhibits from the guilt phase, except an exhibit

that was a picture of Huff, and then rested. Hundley then rested without presenting any evidence.

{¶ 57} The jury unanimously recommended a sentence of death as to Count One, and the court accepted the recommendation and imposed the death sentence. As to the noncapital offenses, the court merged Count Two with Count Three, and Count Four with Count Five, and then sentenced Hundley to 11 years' imprisonment for the attempted-murder conviction in Count Two and to a consecutive 11-year prison term for the aggravated-arson conviction in Count Four.

## III. ANALYSIS

### A. Sufficiency of the evidence

{¶ 58} In proposition of law No. 1, Hundley argues that the state failed to prove beyond a reasonable doubt that he committed the aggravated murder of Huff with prior calculation and design. Hundley argues that there was a lack of sufficient evidence to establish prior calculation and design.

{¶ 59} "In reviewing the sufficiency of the evidence to support a criminal conviction, we must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (Emphasis sic.)" *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 109, quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). " 'Proof beyond a reasonable doubt' is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs." R.C. 2901.05(E). A sufficiency challenge asks whether the evidence adduced at trial "is legally sufficient to support the jury verdict as a matter of law." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 219. In applying this well-known standard, we are cognizant of the jury's responsibility to "fairly * * * resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319,

99 S.Ct. 2781, 61 L.Ed.2d 560.  And we recognize that the jury is the sole judge of a witness's credibility.  *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 60} Proof of "prior calculation and design" requires proof of "a scheme designed to implement the calculated decision to kill."  *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978).  "The amount of care or time that the defendant spends in planning and analyzing the crime are not critical factors in themselves; however, they ' "must amount to more than momentary deliberation." ' "  *State v. Jones*, 91 Ohio St.3d 335, 345, 744 N.E.2d 1163 (2001), quoting *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997), quoting the 1973 Legislative Service Commission comments to R.C. 2903.01.

{¶ 61} Three factors guide our review of Hundley's claim that the evidence was legally insufficient to prove prior calculation and design: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? (3) Was the act drawn out or 'an almost instantaneous eruption of events'?"  *Taylor* at 19, quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976).  We have "never set forth a bright-line test for discerning the presence or absence of prior calculation and design but instead undertake[ ] a unique analysis of the facts of each case."  *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 56.  The evidence relevant to each *Taylor* factor is set forth below.

### 1. *Did the accused and the victim know each other, and was the relationship strained?*

{¶ 62} Undisputed evidence demonstrates that Huff and Hundley knew each other.  Huff had a child with Hundley's brother, and according to Hundley, they had known each another for approximately eight years.  It was this relationship that caused Huff to offer Hundley a room in her home when Hundley's living situation with his brother was not working.  At the time of Huff's murder, Hundley had been living with Huff for three to four weeks.

{¶ 63} Hundley told investigators that he and Huff had a good relationship, but that evidence was controverted by the testimony of Heard and Mrs. Johnson. Heard testified that Huff's demeanor changed after Hundley moved in and that the change was particularly noticeable when Hundley was around. Due to Hundley's controlling nature, Huff would hold "a lot of stuff in" and was not as open with Heard as she had previously been. When Hundley was not in the house, Huff expressed her frustration with the situation to Heard. Hundley's presence in the house made Heard very uncomfortable and also was the cause for the loss of other caretakers. On the last evening Heard saw Huff alive, Heard made sure that Huff had access to her cell phone and her grabbing aid, which Heard testified was not bent when she left the house. At Huff's request, Heard placed the cash from Huff's monthly disability check underneath her thighs, between the bedsheet and Huff's body. And just before she left for the evening Heard gave Huff her personal cell-phone number, even though it was against company policy. According to Heard, she had felt that day that something wasn't right or was going to happen. Heard felt uncomfortable because Hundley "was in the home * * * that night and he was drinking."

{¶ 64} Mrs. Johnson testified that Huff and Hundley generally got along but that their relationship was strained. Hundley argues that an objection to Mrs. Johnson's testimony about the strained relationship was sustained at trial. He is correct that the court sustained an objection to one question: "Around November 6 when this happened, had their relationship become strained?" However, Mrs. Johnson later testified that the relationship had become strained in response to a different question that was asked without an objection. Mrs. Johnson also testified that Hundley expressed his belief that Huff and her family just "weren't into him." Mrs. Johnson explained that her impression of this statement was that her family was not including him: "I guess that's what he felt maybe." Mrs. Johnson also testified that during Hundley's attack on her that he stated that he killed Huff

because Huff had been disrespecting his brother by allegedly wanting to have sex with him.

### 2. Did Hundley give thought or preparation to choosing the murder weapon or murder site?

{¶ 65} The evidence demonstrates that Huff had a progressive form of multiple sclerosis that prevented her from walking. The nurse aides needed to use a Hoyer lift to transfer her from her bed to her wheelchair. Wheelchair bound, she received daily care and assistance from nurse aides. Huff relied on a medical-alert necklace if there was an emergency and a nurse aide was not present; when the alert was pressed, an ambulance was dispatched and Mrs. Johnson was called.

{¶ 66} Hundley acknowledged that Huff was severely disabled and that she was unable to walk or dress herself; he also testified that he was present when a nurse aide moved Huff between her bed and her wheelchair with a Hoyer lift. He returned to the house not long after Heard left knowing Huff would be alone and physically incapable of leaving.

### 3. Was the act drawn out or "an almost instantaneous eruption of events?"

{¶ 67} The final *Taylor* factor requires the evidence to demonstrate that there was more than just a "momentary" thought of deliberation. *Taylor*, 78 Ohio St.3d at 22, 676 N.E.2d 82. Hundley introduced the testimony of Dr. Staubus who stated that chloroform is used to temporarily incapacitate a person. The doctor also testified that while chloroform is so volatile that it immediately evaporates, it is not inconsistent for chloroform to be present on the clothing of the person using it or the person against whom it was administered. Christa Rajendram testified that Hundley's polo shirt and t-shirt tested positive for chloroform.

{¶ 68} The evidence also shows that Hundley inflicted numerous blunt-force injuries on Huff's body while she was alive. Huff was severely beaten on her face and head and on her trunk and extremities, causing rib fractures, massive internal bleeding, and bruising on the front and back of her upper arms and chest,

and she had several defensive wounds on her forearms and hands. Dr. Felo rejected the assertion that the beating was instantaneous; rather, he determined that "[t]he beating t[ook] a while because of the amount of blood that [wa]s accumulated in her body and the fact that the bruising [wa]s developing."

{¶ 69} After the severe and extensive beating Hundley inflicted upon Huff, Hundley then strangled Huff with a black cord wrapped tightly around her neck. Dr. Felo referred to photographs taken during the autopsy and pointed out that there was an indentation on Huff's neck caused by the ligature. He noted that the cord "was tight enough to leave an impression." Moreover, Dr. Felo stated strangulation was also indicated by the evidence of petechial hemorrhages on the whites of Huff's eyes. He opined that it would have taken "several minutes, up to hours" for Huff to have died from the injuries caused by the beating, although "[t]he strangulation would [have been] seconds to minutes as far as a timeframe." He testified that her death "certainly was not an immediate death." Dr. Felo's expert opinion, to a reasonable degree of medical certainty, was that Huff's death was not instantaneous and that Huff was already dead when the fire occurred.

{¶ 70} Huff's medical-alert necklace was activated at 2:01 a.m. Koch, one of the EMTs who responded to the emergency call, testified that a tall African-American man—who the EMT later identified as Hundley—opened the front door. According to Koch, the man was calm and polite and did not seem anxious.

{¶ 71} Mrs. Johnson arrived after the EMTs had left. She testified that she unlocked the bottom lock and that the top lock was uncharacteristically locked. Upon entering the house, she smelled gasoline and found Hundley inside with a gasoline can. Hundley did not leave; he instead waited for Mrs. Johnson to return from placing the gasoline can in the attached garage and then attacked her, striking her in the head with a hammer. And again, after attacking Mrs. Johnson, Hundley did not leave but changed out of his bloody clothes and placed them in his gym bag.

{¶ 72} Construing the foregoing evidence in a light most favorable to the prosecution, there is sufficient evidence to support the *Taylor* factors and the jury's verdict that Hundley committed aggravated murder with prior calculation and design. Despite Hundley's testimony that he and Huff had a good relationship, the jury also heard the testimony from Heard and Mrs. Johnson to the contrary. It was within the province of the jury when considering the conflicts in the testimony to weigh the credibility of the witnesses and reject Hundley's version of the relationship. From Heard's and Mrs. Johnson's testimony, the jury could have reasonably concluded that the relationship between Hundley and Huff was strained. Hundley had a controlling nature and Huff's demeanor changed when Hundley was around. And Huff expressed her frustration with the living situation when he was not present. It was concern for Huff's welfare, because of the strain in the relationship with Hundley, that caused Heard to violate her employer's policy and provide Huff with her cell-phone number. Moreover, the jury could have inferred that Huff did not trust Hundley as she had Heard place her cash under her thigh when Heard left for the evening. The strain in the relationship was also shown by Mrs. Johnson's testimony regarding Hundley's animosity toward her family.

{¶ 73} The jury reasonably could have found that Hundley gave thought to the murder site and to the means by which he would kill Huff. Hundley waited until the nurse aide had left for the evening and Huff was alone before returning to the house. He knew that Huff was unable to defend herself and that she was helpless. She was debilitated by multiple sclerosis and depended upon a nurse aide for the essentials of daily living, including using a Hoyer lift to get from her bed to her wheelchair, which she relied on for mobility. The medical-alert necklace was her sole lifeline in the event of an emergency when the nurse aide was not at the house.

{¶ 74} The evidence is overwhelming that the attack on Huff was not an instantaneous eruption of events. First, it was reasonable for the jury to infer from

the presence of chloroform on both of Hundley's shirts that Hundley sought to incapacitate Huff. The testimony of Dr. Felo established that the beating Hundley inflicted upon Huff was lengthy, severe, and extensive and that Huff had time to try to defend against the brutal attack. Huff was still alive after the savage beating but instead of stopping, Hundley made the conscious choice to strangle her tightly around the neck with a black cord. The nature and extent of the injuries established that Huff's murder was not immediate but was carried out over a period of time.

{¶ 75} Further, the evidence demonstrates that Hundley was determined to follow through on his murderous course of action. The jury reasonably could have found that Hundley locked both the top and bottom door locks after the EMTs left in order to attack Huff and prevent anyone from entering the house and coming to Huff's aid. He also obtained gasoline and poured it on Huff, even though she was dead, and set her body on fire, resulting in thermal injuries and her skin sloughing off, to cover up the evidence of the murder. *See State v. Young,* 7th Dist. Belmont No. 96-BA-34, 1999 WL 771070 (evidence that victim's body was partially concealed was relevant fact to finding of prior calculation and design); *State v. Jackson*, 8th Dist. Cuyahoga No. 44401, 1982 WL 5955 (evidence that defendant wiped clean the victim's doorknobs after the murder supported jury's finding of prior calculation and design). Further, Hundley could have chosen to leave the house after beating and strangling Huff; he instead attacked Mrs. Johnson. He then could have again chosen to leave the house, but instead he changed out of his bloody clothes and placed them in his gym bag.

{¶ 76} We have found sufficient evidence of prior calculation and design in cases in which a murder was not instantaneous "but instead w[as] carried out over a period of time." *Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, at ¶ 60. We have likewise found that prior calculation and design was proved when the evidence established that despite having time to abandon a murderous attack, the defendant demonstrated an "apparent determination to follow through on a

specific course of action," which supported a finding that he had previously "adopted a plan to kill." *State v. Toth*, 52 Ohio St.2d 206, 213, 371 N.E.2d 831 (1977), *modified on other grounds, State v. Muscatello*, 55 Ohio St.2d 201, 378 N.E.2d 738 (1978), paragraph one of the syllabus; *see also Taylor*, 78 Ohio St.3d at 21, 676 N.E.2d 82, quoting *State v. Taylor*, 8th Dist. Cuyahoga No. 65711, 1995 WL 663267, * 5 (Nov. 9, 1995) (prior calculation and design shown by evidence that Taylor " 'made a conscious decision to walk over to where [the injured victim] was crawling face down on the floor and shot him four more times' ").

{¶ 77} When viewed in a light most favorable to the prosecution the evidence demonstrates that Huff's death was the result of a well-thought-out plan and the attack was drawn out. Hundley could have chosen to abandon his course of action at any point but failed to do so. *See State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 45 ("Pursuit of a wounded, helpless victim also has been held to be evidence of prior calculation and design"). There was sufficient evidence that Hundley's actions "went beyond a momentary impulse and show[ed] that he was determined to complete a specific course of action." *Id.* at ¶ 46.

{¶ 78} Viewing the evidence in a light most favorable to the prosecution, a jury could rationally find beyond a reasonable doubt that Hundley murdered Huff with prior calculation and design. We therefore reject Hundley's first proposition of law.

## B. Manifest weight of the evidence

{¶ 79} Hundley also contends, in proposition of law No. 2, that his aggravated-murder conviction was against the manifest weight of the evidence.

{¶ 80} A verdict can be against the manifest weight of the evidence even though legally sufficient evidence supports it. *State v. Robinson*, 162 Ohio St. 486, 487, 124 N.E.2d 148 (1955). For a manifest-weight challenge, " '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts

in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A manifest-weight challenge can be successful " 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at175.

{¶ 81} Hundley contends that the state's evidence "satisfies none of the *Taylor* factors" and therefore that the jury lost its way when it found that he purposely murdered Huff with prior calculation and design. *See Taylor*, 78 Ohio St.3d at 19, 676 N.E.2d 82. We do not find Hundley's argument persuasive. As explained above, we disagree with Hundley and instead find that all three *Taylor* factors were met in this case.

{¶ 82} This is not an " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin,* 20 Ohio App.3d at 175, 485 N.E.2d 717. Proposition of law No. 2, therefore, lacks merit.

### C. Request for standby counsel and waiver of counsel

{¶ 83} During the suppression and mitigation hearings, Hundley waived counsel and represented himself. Hundley argues, in proposition of law No. 4, that the trial court violated his constitutional rights when it denied him standby counsel for the suppression hearing. And in proposition of law No. 3, Hundley maintains that the trial court erred by allowing him to waive counsel for the mitigation hearing despite his "questionable mental health history" and despite that he was in a "fit of pique" when he requested to represent himself.

### 1. Relevant facts

{¶ 84} Hundley was arraigned on November 17, 2015, and entered a plea of not guilty. At a pretrial hearing on December 9, Hundley told the court that he wished to fire his appointed attorneys. The court explained that he had no right to

fire his attorneys, denied Hundley's request, and ordered his attorneys to notify the court if the attorney-client relationship had broken down beyond repair. In January 2016, at another pretrial, defense counsel informed the court that on Hundley's behalf, they had filed a motion for a competency and sanity evaluation, and pending the results, they might enter a not-guilty-by-reason-of-insanity plea. At the next hearing on April 13, 2016, defense counsel sought to withdraw from representation because it had "become readily apparent" that the attorney-client relationship had "completely broken down." Counsel also informed the court that the competency and sanity reports were complete and that Hundley had been found to be sane and competent to stand trial. One week later, the trial court granted defense counsel's motion to withdraw and appointed two new attorneys to represent Hundley.

{¶ 85} At a hearing on July 13, 2016, Hundley informed the court that he did not want to continue with his second set of attorneys. The court denied this request and ordered Hundley to be placed at the Twin Valley Behavioral Healthcare–Timothy B. Moritz Forensic Unit ("TVBH") for observation and a second competency evaluation.

{¶ 86} The court reconvened on December 16, 2016, for a competency hearing. After testimony, the court determined that Hundley was competent. At that juncture, Hundley told the court that he was "thinking about representing [him]self." A brief discussion ensued between the court and Hundley regarding the purpose of standby counsel and the fact that before he could waive his right to counsel, the court would have to ask him 52 questions to ensure that he understood what he was getting himself into." The court agreed to address the issue of Hundley's waiver of counsel at a January 2017 pretrial hearing.

{¶ 87} On January 11, 2017, Hundley told the court that his attorneys had answered all of his questions and that he wanted to keep his current counsel. Hundley remained satisfied with his counsel for the next seven months, which the court confirmed at many of the hearings during that time period.

{¶ 88} On August 7, 2017, defense counsel informed the court that Hundley wanted to represent himself and that Hundley was prepared to go forward with the suppression hearing scheduled for that day. Hundley confirmed counsel's statement, telling the court that he wanted to represent himself. The trial court questioned Hundley regarding his request to waive counsel. The court's questions focused on Hundley's understanding of his right to counsel, his lack of a legal education, his familiarity with the criminal-justice system and the rules applicable to a criminal trial, and the possibility that the jury would negatively perceive his lack of an attorney.

{¶ 89} The court explored other likely pitfalls of self-representation, asking whether Hundley understood that he would be held to the same standard as if he were a licensed attorney, that the court would not function as his lawyer, and that he would be waiving certain appellate claims by representing himself. The court also inquired into his awareness of any applicable defenses to the charges. The court ensured that Hundley understood the role of standby counsel. The trial court briefly informed him of the charges he was facing, the potential sentences should he be found guilty, and his constitutional right to remain silent. Ultimately, the court accepted Hundley's request to waive counsel, and he represented himself for the suppression hearing.

{¶ 90} Yet when the court presented Hundley with a written waiver-of-counsel form after the suppression hearing, Hundley indicated that he had changed his mind and wanted counsel to represent him. The court accepted his withdrawal of the waiver and denied defense counsel's request to reopen the suppression hearing.

{¶ 91} At a hearing on September 6, 2017, Hundley again asked to waive his right to counsel. However, during the waiver colloquy, the court agreed to appoint new defense counsel from a different county, and Hundley withdrew his waiver. But before the hearing ended, Hundley changed his mind again, and after

conducting a waiver colloquy, the court found that he had knowingly, intelligently, and voluntarily waived his right to counsel.

{¶ 92} The next day, the court held a hearing and told Hundley that an attorney from the Ohio Public Defender's Office was able to represent him. Hundley agreed to meet with the new attorney. At the next hearing on September 18, Hundley told the court that he still wished to represent himself despite having met with the assistant public defender. The court reaffirmed that his prior counsel were considered standby counsel and would be available in that capacity, unless he withdrew the waiver.

{¶ 93} Hundley represented himself until November 1, 2017, when the court appointed an assistant public defender, Greg Meyers, to act as lead counsel, and one of Hundley's prior attorneys, Doug Taylor, to act as second chair. Meyers and Taylor represented Hundley through the trial phase, up until the jury reached a verdict. At most of the status hearings between November 2017 and the beginning of the trial, the court verified that Hundley was continuing to work well with Meyers and Taylor; each time, Hundley said that he was.

{¶ 94} On May 21, 2018, the jury returned its verdict, finding Hundley guilty of all charges and the course-of-conduct specification. On May 30, the day the mitigation hearing was scheduled to begin, Hundley informed the trial court that he wanted to represent himself for the mitigation hearing. The trial court told Hundley that his request was untimely, but when Hundley pressed the issue and stated that he was prepared to move forward with the mitigation hearing, the court responded: "That's fine. You know what, I will * * * [a]nd when you get convicted of death, I don't want to hear about it."

{¶ 95} At the request of the prosecutor and defense counsel, the court conducted a waiver colloquy. The court went through the same questions and warnings as it had during the waiver colloquy prior to the suppression hearing. Hundley represented himself through the mitigation hearing. He did not offer any

mitigating evidence and declined to give an unsworn statement, but he did give a closing argument.

## 2. Analysis

{¶ 96} " 'The Sixth Amendment * * * guarantees that a defendant in a state criminal trial has an independent constitutional right of self-representation and that he may proceed to defend himself without counsel when he voluntarily, and knowingly and intelligently elects to do so.' " (Ellipsis in *Neyland*.)   *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 71, quoting *State v. Gibson*, 45 Ohio St.2d 366, 345 N.E.2d 399 (1976), paragraph one of the syllabus.   Therefore, in any criminal case involving a serious offense, "when a criminal defendant elects to proceed pro se, the trial court must demonstrate substantial compliance with Crim.R. 44(A) by making a sufficient inquiry to determine whether the defendant fully understood and intelligently relinquished his or her right to counsel." *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, paragraph two of the syllabus.

{¶ 97} The trial court must ensure that the defendant is "made aware of the dangers and disadvantages of self-representation," *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and that " 'he [knew] what he [was] doing and his choice [was] made with eyes open,' " *id.,* quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942).   "The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

*a. Request for standby counsel for suppression hearing*

{¶ 98} Hundley contends, in his fourth proposition of law, that the trial court denied him standby counsel for the suppression hearing and thereby violated his right to counsel under both the state and federal Constitutions.[1]

{¶ 99} We have "recognized that '[o]nce the right to counsel is properly waived, trial courts are *permitted* to appoint standby counsel to assist the otherwise pro se defendant.' " (Emphasis added.) *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 50, quoting *Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, at ¶ 28. Therefore, there is no independent right, under state or federal law, to standby counsel in the event that a criminal defendant chooses self-representation. *See State v. Jackson*, 1st Dist. Hamilton No. C-180160, 2019-Ohio-2933, ¶ 9 ("while trial courts may well decide to appoint standby counsel, defendants do not have an automatic right entitling them to standby counsel").

{¶ 100} In any event, the record does not support Hundley's claim that the trial court denied him standby counsel for the suppression hearing. On the contrary, the trial court ensured that Hundley understood the purpose of standby counsel, and Hundley conferred with defense counsel prior to and immediately after the suppression hearing.

{¶ 101} We therefore reject Hundley's fourth proposition of law.

*b. Self-representation for the mitigation hearing*

{¶ 102} In his third proposition of law, Hundley contends that the court erred by granting his request to waive counsel for the mitigation hearing while he was "(1) in a fit of pique (2) likely under the duress of a personality disorder and (3) under the influence of a fair amount of goading and sarcasm from the trial court."

---

1. Hundley does not contend that the trial court erred by allowing him to represent himself during the suppression hearing.

**{¶ 103}** A capital defendant must make a timely and unequivocal request if he or she wishes to waive counsel because " '[w]hile the right to counsel attaches unless affirmatively waived, the right to self-representation does not attach until asserted.' " *State v. Perry*, 9th Dist. Summit No. 25271, 2011-Ohio-2242, ¶ 11, quoting *Sandoval v. Calderon*, 241 F.3d 765, 774 (9th Cir.2000). And because "courts [must] indulge in every reasonable presumption against waiver" of the right to counsel, a strict standard applies when considering the sufficiency of a defendant's invocation of the right to self-representation. *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). An unequivocal request may not be a "momentary caprice or the result of thinking out loud," *Adams v. Carroll*, 875 F.2d 1441, 1445 (9th Cir.1989), "or the result of frustration," *Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, at ¶ 73. Whether a defendant voluntarily, intelligently, and knowingly waived his right to counsel is "determined by the totality of circumstances." *State v. Moore*, 81 Ohio St.3d 22, 31, 689 N.E.2d 1 (1998). Whether a defendant's waiver of counsel was knowing, voluntary, and intelligent necessarily requires a thorough review of the record.

**{¶ 104}** Hundley asserts that his request to waive counsel for the mitigation hearing came "immediately following a guilty verdict in a death penalty [case]" and that the trial court should therefore not have granted it. But the record contradicts Hundley's contention; he asked to represent himself on the day of the mitigation hearing, nine days after the verdict. By then, Hundley had been represented by counsel throughout most of the pretrial proceedings and the entire trial phase, but he had also repeatedly sought to represent himself in earlier stages of the proceedings and was therefore familiar with the warnings and admonitions against waiving counsel.

**{¶ 105}** Notwithstanding the earlier colloquies, the trial court conducted a waiver colloquy with Hundley prior to the mitigation phase. The court again explained to Hundley that he had a right to counsel; that he faced possible sentences

including the death penalty and life without parole; that he would waive certain appellate claims by waiving counsel for mitigation, and that he would be held to the same standard as any attorney. The court ensured that Hundley understood the difficulties and disadvantages of self-representation, that the court would not function as his lawyer, and that the jurors may have a negative reaction to Hundley representing himself. After these advisements, Hundley told the court that his decision was freely made and reflected his personal desire. Hundley declined the court's offer to clarify any of the advisements or to answer any questions. Hundley signed a written waiver, and the court appointed defense counsel to act as standby counsel.

{¶ 106} The transcript of the court proceedings prior to the mitigation hearing corroborates the fact that Hundley was not equivocal or emotional when he asked to waive counsel:

> MR. MEYERS: I would ask the court to allow Mr. Hundley to address you directly for a moment.
>
> THE COURT: That's fine.
>
> HUNDLEY: Yes, Your Honor. At this time I would like to represent myself.
>
> * * *
>
> THE COURT: It's not timely.
>
> HUNDLEY: It's not timely?
>
> THE COURT: Yes.
>
> HUNDLEY: It's my constitutional right. I would like to represent myself for the second phase.

{¶ 107} Hundley's argument that his request was not knowing, intelligent, and voluntary because he was "likely under the duress of a personality disorder"

and was goaded by the trial court lacks merit. Dr. Delaney Smith, M.D., the psychiatrist who performed one of Hundley's pretrial competency evaluations, testified that Hundley's antisocial-personality disorder did not affect his competency or decisionmaking abilities. Dr. Smith testified that "people with personality disorders still have a conscious choice over how they interact." The record does not support the claim that a severe mental disorder or illness had any effect on Hundley's requests to waive counsel.

{¶ 108} Finally, Hundley's claim that the trial court's conduct during the hearing goaded him into waiving counsel is specious. When Hundley initially asked to waive counsel for mitigation, the trial court told him that his request was untimely. Undeterred, Hundley reasserted his request, to which the court responded, "That's fine. You know what, I will." And after Hundley expressed satisfaction with the court's decision to grant his request, the court stated: "And when you get convicted of death, I don't want to hear about it." The trial court's comments, while inadvisable, did not change Hundley's position on self-representation.

{¶ 109} The record contradicts Hundley's attempt to portray his request to waive counsel for the mitigation hearing as an emotional response to the jury's verdict, a result of his antisocial-personality disorder, and a product of the trial court's conduct. Hundley was neither emotional nor complaining about counsel when he made his request, and he did not respond at all to the trial court's sarcastic comments, showing his emotional control. More than a week had passed between the jury's verdict and Hundley's request, the jury was not present during this discussion, the request was not part of an inappropriate outburst, and Hundley did not indicate that his request was due to frustration with his counsel's conduct. *See, e.g., State v. Baskin*, 3d Dist. Allen No. 1-18-23, 2019-Ohio-2071, ¶ 17 (holding that a request to waive counsel was not unequivocal because Baskin had "interjected in front of the jury" that he wanted to fire counsel and because he had

"repeatedly made inappropriate responses to the trial court's questions" regarding self-representation); *see also State v. Steele*, 155 Ohio App.3d 659, 2003-Ohio-7103, 802 N.E.2d 1127, ¶ 20 (defendant's requests for self-representation "were more in the name of impulsive acts expressing frustration with his first counsel than unequivocal requests to represent himself").

{¶ 110} We hold that Hundley knowingly, intelligently, and voluntarily waived his right to counsel for his mitigation hearing, and we reject Hundley's third proposition of law.

### D. Fundamental fairness of the mitigation hearing

{¶ 111} In his fifth proposition of law, Hundley argues that the trial court's comments prior to the mitigation hearing were facetious and rendered the mitigation hearing fundamentally unfair.

{¶ 112} A capital sentencing hearing is a critical stage of any criminal proceeding and "must satisfy the requirements of the Due Process Clause." *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). A sentencing hearing fails to satisfy a criminal defendant's right to due process when the trial court imposes a sentence "on the basis of assumptions concerning [the defendant's] criminal record which were materially untrue." *Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 93 L.Ed. 1690 (1948). During the sentencing hearing in *Townsend*, the trial court recounted Townsend's prior convictions, and with regard to one prior offense, remarked: "1937, receiving stolen goods, a saxophone. What did you want with a saxophone? Didn't hope to play in the prison band then, did you?" *Id.* at 740. In fact, the charge of receiving the stolen saxophone had been dismissed. The United States Supreme Court granted Townsend's petition for a writ of habeas corpus, finding that the trial court's "facetiousness," *id.,* was part of the reason that Townsend was deprived of due process during sentencing. *Id.*

{¶ 113} Hundley's reliance on *Townsend* is misplaced. As we have acknowledged, "[t]he *Townsend* court carefully narrowed the scope of the fairness standard that it applied, saying, 'It is not the duration or severity of this sentence that renders it constitutionally invalid; it is the careless or designed pronouncement of sentence on a foundation so extensively and materially false, which the prisoner had no opportunity to correct * * * that renders the proceedings lacking in due process.' " (Ellipsis in *Arnett*.) *State v. Arnett*, 88 Ohio St.3d 208, 218, 724 N.E.2d 793 (2000), quoting *Townsend* at 741.

{¶ 114} In contrast, the trial court's statement here—"When you get convicted of death, I don't want to hear about it"—though careless, clearly had to do with the court's feelings about Hundley waiving counsel for the mitigation hearing and did not form the basis of Hundley's death sentence. *See State v. Buggs*, 7th Dist. Mahoning No. 06 MA 28, 2007-Ohio-3148, ¶ 14 ("While [the court's] remarks were very pointed, and in some lights, very harsh, no error in sentencing occurred which arises solely from these remarks"). The court did not make its remarks in front of the jury, and the record indicates that the court based its sentence on the appropriate factors outlined in the Revised Code, after the jury recommended the death sentence. Accordingly, Hundley has not demonstrated that the trial court's comments deprived him of due process during sentencing. Therefore, we reject proposition of law No. 5.

### E. Sentencing Issues

#### 1. Supplemental jury instruction during sentencing deliberations

{¶ 115} The jury deliberated regarding sentencing for less than one day. After approximately four and one-half hours,[2] the jury sent a note to the court: "Jury is at a standstill. 11 of 12 in agreement. 12 unwilling to change." Without consulting the parties, the trial court provided the jury with a supplemental

---

2. During this time, the jury returned to the courtroom several times with questions and for breaks.

instruction, stating, "I am going to inform you you must deliberate until 4:30. At 4:30 we will stop and go to the hotel." As instructed, the jury resumed deliberations. Just over 30 minutes elapsed before the jury returned to the courtroom and told the court it had reached a verdict recommending that Hundley be sentenced to death.

{¶ 116} Hundley argues, in his sixth proposition of law, that the trial court erred when it ordered the jury to continue deliberating after it indicated that it was at a "standstill." Hundley did not object when the trial court instructed the jury to resume deliberations and therefore has waived all but plain error. To prevail, Hundley must show that an error occurred, that the error was plain, and that the error affected his substantial rights. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002) (an error affects substantial rights only if it affected the outcome of the trial). However, after reviewing the record, we conclude that the trial court did not commit any error, plain or otherwise.

{¶ 117} Because "Ohio's death-penalty statutes do 'not contemplate the possibility of a hung jury in the penalty phase of a capital murder trial,' " *State v. Mason*, 82 Ohio St.3d 144, 166-167, 694 N.E.2d 932 (1998), quoting *State v. Springer*, 63 Ohio St.3d 167, 170, 586 N.E.2d 96 (1992), we have approved of the use of supplemental instructions when a capital jury has become "irreconcilably deadlocked" on the question of whether to recommend a death sentence, *id*. at 167. Therefore, an instruction "urging jurors to continue deliberations to try to reach a unanimous penalty verdict * * * do[es] not violate due process." *Id.*, citing *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

{¶ 118} As we have explained, a supplemental instruction to a deadlocked jury "must not be coercive by stressing that the jury must reach a verdict." *State v. Howard*, 42 Ohio St.3d 18, 23-24, 537 N.E.2d 188 (1989). In addition, "the supplemental instruction must be balanced and neutral. It cannot * * * single out jurors in the minority and urge them to reconsider their position." *Id*. at 24. The

trial court's supplemental instruction in this case merely directed the jury to continue deliberations until 4:30 p.m.; the instruction was balanced, neutral, and noncoercive and therefore appropriate under *Howard*.

{¶ 119} Hundley argues that by indicating that it was at a standstill, the jury in his case was "irreconcilably deadlocked," requiring the trial court to instruct the jurors to consider only the available life sentences. He is incorrect. "No exact line can be drawn as to how long a jury must deliberate in the penalty phase before a trial court should instruct the jury to limit itself to the life sentence options or take the case away from the jury * * *. Each case must be decided based upon the particular circumstances." *Mason* at 167. Although the jury stated that it was at a standstill after only approximately four and one-half hours of deliberation, the circumstances do not show that the jury was irreconcilably deadlocked. The trial court properly instructed the jury to continue deliberations. Accordingly, Hundley has not demonstrated any error, much less an error that affected his substantial rights. We reject proposition of law No. 6.

### 2. *Request to consider mercy as a mitigating factor*

{¶ 120} The jury sent the following question to the court during deliberations on sentencing: "Is mercy considered a mitigating factor under Ohio law?" The trial court, without consulting counsel, told the jury that mercy is not a mitigating factor. In his seventh proposition of law, Hundley challenges the trial court's response to the jury's question.

{¶ 121} We have held that "[p]ermitting a jury to consider mercy, *which is not a mitigating factor* and therefore [is] irrelevant to sentencing, would violate the well-established principle that the death penalty must not be administered in an arbitrary, capricious or unpredictable manner." (Emphasis added.) *State v. Lorraine*, 66 Ohio St.3d 414, 417, 613 N.E.2d 212 (1993). Hundley acknowledges *Lorraine*'s unambiguous holding but argues that the decision should be reexamined

36

and overruled. Despite Hundley's contentions, the trial court's response to the question asked by the jury is a correct statement of Ohio law.

{¶ 122} In Hundley's view, because Ohio is a "weighing" state, an instruction on mercy is required to foreclose constitutional error. A "weighing" state refers to a state "in which the only aggravating factors permitted to be considered by the [capital] sentencer were the specified eligibility factors." *Brown v. Sanders*, 546 U.S. 212, 217, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006). By contrast, a nonweighing state permits the jury to consider aggravating factors different from, or in addition to, the eligibility factors. *Id.* Yet Hundley cites *Kansas v. Marsh*, 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), and *Kansas v. Carr*, ___ U.S. __, 136 S.Ct. 633, 193 L.Ed.2d 535 (2016), to support this claim. However, neither case involved this question nor held that an instruction on considering mercy in mitigation is required. And we have recently considered the same arguments and rejected them. *See State v. Wilks*, 157 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 179, 224.

{¶ 123} Because Hundley has offered no meritorious justification for departing from this settled law, proposition of law No. 7 lacks merit.

### F. Constitutional and international-law challenges

{¶ 124} In proposition of law No. 10, Hundley raises several constitutional challenges to the death penalty and the statutes governing its imposition in Ohio, including that they constitute cruel and unusual punishment, violate his rights to due process and equal protection, are arbitrary and vague, burden the right to a jury, prevent adequate appellate review, and violate international law and treaties. We have consistently rejected each of these arguments. *See*, *e.g.*, *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 106, 109-110, 113, 116-117, 120; *State v. Jenkins*, 15 Ohio St.3d 164, 168-173, 473 N.E.2d 264 (1984).

{¶ 125} In proposition of law No. 9, Hundley contends that Ohio's death-penalty statutes violate the Sixth Amendment right to a jury trial as construed in

*Hurst v. Florida*, __ U.S. __, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016). We have rejected this argument. *State v. Mason*, 153 Ohio St.3d 476, 2018-Ohio-1462, 108 N.E.3d 56. And the United States Supreme Court has recently confirmed that neither *Hurst* nor *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), requires jury weighing of aggravating and mitigating circumstances:

> [A] jury must find the aggravating circumstance that makes the defendant death eligible. But importantly, in a capital sentencing proceeding just as in an ordinary sentencing proceeding, a jury (opposed to a judge) is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the ultimate sentencing decision within the relevant sentencing range.

*McKinney v. Arizona,* ___U.S. ___, 140 S.Ct. 702, 707, ___ L.Ed.2d ___ (2020).

{¶ 126} We therefore summarily overrule proposition of law Nos. 9 and 10. *See generally State v. Poindexter*, 36 Ohio St.3d 1, 520 N.E.2d 568 (1988), syllabus.

### G. Cumulative error

{¶ 127} In his eighth proposition of law, Hundley argues that cumulative error during the proceedings requires this court to reverse his conviction and grant him a new trial. But because Hundley has not demonstrated that any error occurred during his capital trial, his argument is not meritorious. *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 148, quoting *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995) (cumulative-error doctrine does not apply because the appellant cannot point to " 'multiple instances of harmless error' "). We reject proposition of law No. 8.

## IV. INDEPENDENT SENTENCE EVALUATION

{¶ 128} We must independently review the death sentence for appropriateness and proportionality. R.C. 2929.05(A). In conducting this review, we must determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether Hundley's death sentence is proportionate to those affirmed in similar cases. *Id.* We consider these issues de novo. *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 272.

### A. Aggravating Circumstance

{¶ 129} The jury found Hundley guilty of aggravated murder and the capital specification associated with that charge. As an aggravating circumstance, therefore, the jury considered that Huff's murder "was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons." R.C. 2929.04(A)(5).

{¶ 130} Sufficient evidence established that Hundley attempted to murder Mrs. Johnson. Mrs. Johnson's testimony regarding Hundley's assault on her with a hammer and a knife and by dousing her with alcohol to start a fire constitutes sufficient evidence of attempted murder. Therefore, sufficient evidence supported the jury's findings that Hundley murdered Huff as part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons.

### B. Mitigating Factors

{¶ 131} We must weigh the above aggravating circumstance against any mitigating evidence about "the nature and circumstances of the offense" and Hundley's "history, character, and background." R.C. 2929.04(B). In addition, we must consider and weigh any evidence of the mitigating factors specifically listed in R.C. 2929.04(B)(1) through (7).

### 1. Evidence at the mitigation hearing

{¶ 132} As discussed in connection with proposition of law No. 3, Hundley represented himself at the mitigation hearing and chose to offer no mitigating evidence. He declined to make an opening statement and waived his right to make an unsworn statement. Although Hundley made a closing argument, he used it to contest the state's evidence, accuse the state of manipulating evidence, and deny that he murdered Huff. In allocution, Hundley stated only that he intended to appeal his conviction and death sentence.

### 2. Mitigating evidence in the record

{¶ 133} Although Hundley presented no evidence during the mitigation hearing, under R.C. 2929.05(A), we "shall review and independently weigh all of the facts and other evidence disclosed in the record." The record in this case contains two pretrial competency reports that were prepared in order to assist the trial court in determining whether Hundley was competent to stand trial. To fulfill our duty under R.C. 2929.05(A), we will consider an unsealed competency report that is part of the record for any mitigating evidence contained in it. *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 255.

#### a. Dr. Thomas G. Gazley's competency report

{¶ 134} Pursuant to a trial-court order, on February 4, 2016, at the Mahoning County Justice Center, Thomas G. Gazley, Ph.D., evaluated Hundley to determine whether he was competent to stand trial. Dr. Gazley's report included information about Hundley's family background.

{¶ 135} The report stated that Hundley was born on October 8, 1969, in Washington, D.C., and lived there most of his life. Hundley had two brothers, his parents were married when he was born, and he did not report any parental abuse or neglect. His father died of a heart condition in 1991, and his mother died from cancer in 2014. Hundley had never been married, and to his knowledge, had no children. Hundley had family in Youngstown, Ohio, whom he occasionally visited.

{¶ 136} Hundley dropped out of high school in the tenth grade because, he claimed, he "was making too much money as a drug dealer." He later earned a high-school-equivalency certificate ("GED"), attended community college, and became certified as an EMT and as a heating, ventilation, and air-conditioning technician. He worked as an EMT for a private ambulance company in Washington, D.C., and later worked for a heating company.

{¶ 137} Hundley then graduated from a truck-driving school and started a transportation business that he named after his mother. Although he reported that the business was successful, he shut it down in June 2015 and went to Youngstown. He apparently intended to return to Washington, D.C., but he was convicted in Ohio on a falsification charge and a misdemeanor drug offense. He was serving the jail sentence imposed for those crimes at the time of Dr. Gazley's evaluation.

{¶ 138} Hundley had a prior criminal record both as a juvenile and an adult. He reported that at a very young age, he helped his brother in a breaking and entering. He was also charged as a juvenile for selling drugs and was placed on probation. In 2000, Hundley was convicted in Washington, D.C., of a sex offense that he described as nonconsensual "sexual touching" and was sentenced to 2 years in prison. He served 14 months followed by 2 years of probation.

{¶ 139} Hundley had no physical limitations, and Dr. Gazley reported that during the evaluation, Hundley was in good behavioral control, he cooperated with the evaluation, and he was generally polite. He reported no history of treatment for or diagnosis of mental illness, but he did state that his mother had been diagnosed with schizophrenia and that his older brother had something, that he was a menace, and that he had been locked up a lot.

{¶ 140} During the evaluation, Hundley spoke in a clear and coherent manner, gave "goal directed and relevant" responses to questions, and did not display any disassociation or delusional themes. According to Dr. Gazley, "[t]here was no current evidence of thought disorder either in form or in content."

Hundley's "emotional expression was full range and it was mood congruent," and he reported no instances of depression and no suicidal ideation or attempts. Hundley did not experience any hallucinations, current or historical, and was oriented to person, place, time, and situation. He was not distracted during the evaluation, and he displayed a good memory for recent and remote events.

{¶ 141} Dr. Gazley estimated that Hundley's verbal intelligence was average, noting that Hundley had completed his GED and taken classes at a community college. Dr. Gazley concluded that Hundley presented no current symptoms of mental illness that would interfere with his ability to participate in the legal process, that he was not intellectually impaired, and that he was in good behavioral control.

### b. Dr. Smith's evaluation and report

{¶ 142} On September 22, 2016, pursuant to the trial court's order, Hundley was admitted to TVBH for evaluation of his mental condition and competency. *See* R.C. 2945.371. R.C. 2945.371, among others, governs "the procedures for evaluating the mental condition of a defendant who has raised the issue of competency or entered a plea of [not guilty by reason of insanity]." *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 23. On October 14, 2016, Dr. Smith evaluated Hundley to assess his mental status and his capacity to understand the nature and objectives of the proceedings against him and to assist in his defense. Hundley claimed both that he smoked marijuana and that he never used it and claimed that he drank only a 12 pack of beer a year.

{¶ 143} Approximately one-half of Dr. Smith's report summarizes Hundley's stay at TVBH. Hundley was uncooperative while he was at the facility. The psychiatrist who interviewed him upon admission observed that he "appeared to be malingering memory problems and 'voices' " and that he was angry at his attorneys for sending him there. He claimed that a pill given to him at the jail caused him to hear voices, but he refused to answer any questions about the voices

and told the psychiatrist, "I'm trying to block that shit out." He was evasive in answering questions, at times stating he used marijuana as much as he could but then immediately claiming he had never used it. Dr. Smith reported that the psychiatrist had written that Hundley " 'had no delusions, no disorganization in thinking, no manic, depression, or anxiety symptoms, and did not appear to be responding to any internal stimuli.' "

{¶ 144} Hundley's TVBH records indicate that at admission, he was diagnosed with "Antisocial Personality Disorder; Rule out malingering of mental illness and memory deficits; Tobacco Use Disorder, severe, currently in a controlled environment; rule out other substance use disorder, hypertension, history of back injury in 2003 with chronic pain; history of burns to chest and left cheek in 2015." While on the unit, he presented as angry but did not have any physical confrontations with peers or staff, and although hostile, he did not exhibit behaviors or signs of psychosis. The staff at TVBH did not witness any signs or symptoms of mental illness while Hundley was in their care. On October 4, 2016, staff noted that with respect to his irritability, he tended to be abrupt and refused to engage with staff other than when he was expressing his needs or voicing complaints. He presented as entitled and refused to attend groups. However, staff stated that there had been "no evidence of a major affective disorder, psychosis or thought disorder." A note from October 12, 2016, stated that he had made some claims about being beat up but told police that he had lied about it.

{¶ 145} According to Dr. Smith, during her evaluation, Hundley "was cooperative only when it suited him such as to discuss his dislike of food (which he was eating without issues during the interview) or complain about certain staff." Dr. Smith said that when she asked specific questions, he typically responded with "next" or "I don't know" or just stared at her. Hundley acknowledged that he was facing charges related to Erika Huff. He refused to name the exact charges but stated that his "life was on the line." He refused to discuss the events leading up to

the crime, and when asked, he got very irritable, yelled that he was done, and stormed out of the room.

{¶ 146} Dr. Smith's report notes that Hundley "had no prior history of psychiatric outpatient or inpatient treatment and was never on psychotropic medications." To a reasonable degree of medical certainty, Dr. Smith opined:

> [Hundley] does not have a mental illness but * * * his presentation is best explained by a diagnosis of Antisocial Personality Disorder. Criteria for antisocial personality disorder include an enduring pattern of disregard for and violation of the rights of other[s] since youth which often involved breaking the law. * * *
>
> * * * [A]ntisocial personality disorder is associated with repeated deceit and a lack of empathy as well as hostility, anger, irritability and impulsivity which is consistent with the documentation of his behavior over the course of his hospitalization.

### 3. Statutory mitigating factors, R.C. 2929.04(B)(1) through (6)

{¶ 147} The mitigating factors specified in R.C. 2929.04(B)(1) through (6) are inapplicable. There was no evidence that the victim induced or facilitated the murder and no evidence of duress, coercion, or provocation. And despite the fact that on the night of the offense Hundley told Heard that he needed mental help, there is no evidence of any mental disease or defect. R.C. 2929.04(B)(1) through (3). Because Hundley was 46 at the time of the murder, under R.C. 2929.04(B)(4), youth is not a factor. *See State v. Frazier*, 61 Ohio St.3d 247, 258, 574 N.E.2d 483 (1991). Hundley had documented prior criminal convictions and a juvenile adjudication. Finally, the degree of participation under R.C. 2929.04(B)(6) is not a factor: Hundley was the sole offender.

### 4. Nature and circumstances of the offense

{¶ 148} The nature and circumstances of the aggravated murder offer nothing in mitigation. Hundley severely beat and strangled Huff, who suffered from an advanced state of multiple sclerosis and who had opened her home to him. He then lit her body on fire. He savagely beat Huff's mother, Mrs. Johnson, with a hammer, and after placing her unconscious body next to the body of her dead daughter, he attempted to light her on fire as well. These horrific crimes lack any mitigating features.

### 5. History, character, and background

{¶ 149} Hundley did not report any family history of substance abuse or parental abuse and neglect. Although he dropped out of high school during his sophomore year, he later got a GED and multiple professional certifications. Hundley started a business and held multiple jobs, but he was not employed at the time of the offense.

### 6. Remorse

{¶ 150} Hundley declined to give an unsworn statement. However, he did make a closing argument at the mitigation hearing, during which he accused the prosecutors of manipulating evidence, contested his conviction, and rued his decision to have counsel for the guilt phase. And in allocution, Hundley simply stated that he intended to appeal his conviction and death sentence. He exhibited no remorse for his conduct.

### 7. The weight of mitigating factors

{¶ 151} There is nothing in Hundley's background that is mitigating, and he presented no mitigating evidence. The available record evidence suggests that Hundley has generally lived a life devoid of significant trauma.

{¶ 152} Mitigating factors are nonexistent. Therefore, we conclude that the aggravating circumstance in this case significantly outweighs the mitigating factors beyond a reasonable doubt.

## C. Proportionality

{¶ 153} We find that the death penalty in this case is appropriate and proportional, when compared to other cases in which the death penalty was imposed for a course-of-conduct specification involving a murder and an attempted murder. R.C. 2929.05; *see, e.g., Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, at ¶ 250 (upholding death sentence for one murder and two attempted murders, and citing cases); *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857 (one murder and one attempted murder); *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023 (one murder and one attempted murder); *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229 (one murder and one felonious assault).

{¶ 154} For the foregoing reasons, we affirm the convictions and death sentence.

Judgment affirmed.

O'CONNOR, C.J., and FRENCH, FISCHER, DEWINE, and STEWART, JJ., concur.

DONNELLY, J., concurs in judgment only.

_____

Paul J. Gains, Mahoning County Prosecuting Attorney, and Ralph M. Rivera, Assistant Prosecuting Attorney, for appellee.

Rhys B. Cartwright-Jones and John P. Laczko, for appellant.

_____