[Cite as *State v. Habib*, 2023-Ohio-1338.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | : | Hon. Craig R. Baldwin, J. |
| | : | Hon. Andrew J. King, J. |
| -vs- | : | |
| | : | |
| GEORGE M.S. HABIB | : | Case No. 22 CAA 01 0007 |
| | : | |
| Defendant-Appellee | : | O P I N I O N |


CHARACTER OF PROCEEDING:          Appeal from the Court of Common
                                  Pleas, Case No. 21 CR I 02 0101




JUDGMENT:                         Affirmed




DATE OF JUDGMENT:                 April 24, 2023




APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

JOEL C. WALKER                            WILLIAM T. CRAMER
145 N. Union Street                       470 Olde Worthington Road
3rd Floor                                 Suite 200
Delaware, OH  43015                       Westerville, OH  43082

*King, J.*

{¶ 1}  Defendant-Appellant George M.S. Habib appeals the January 3, 2022 judgment of conviction and sentence of the Delaware County Court of Common Pleas. Plaintiff-Appellee is the state of Ohio.

Facts and Procedural History

{¶ 2}  On August 3, 2020, Appellant and six friends went to Alum Creek with the plan of renting a ski boat to go tubing on the lake. The friends included Amjad Krayem, Miguel Petrarca, Yzen Al-Marrawi, Mohamed "Malak" Soumakieh, Joseph Youseef, and Omar Mahli. Transcript of Trial (T.) 491-497.

{¶ 3}  Malak rented the boat, and he and Yzen completed the mandatory boating exam to obtain a one-day license. T. 498-499, 554, 599. No other member of the group was licensed to operate a watercraft.

{¶ 4}  A marina employee directed the men to a boat - a 1996 Bayliner Capri - and Malak drove the boat out of the marina. Once out on the lake, Amjad and Yzen got on the tube first with Malak driving the boat. T. 500-502. While towing Amjad and Yzen, Malak made slight turns left and right, and ensured the tube was behind the boat again before making those turns. T. 508-509.

{¶ 5}  After several minutes, Amjad and Yzen got back in the boat and Appellant and Malak took a turn on the tube while Amjad drove. T. 620. Amjad drove the boat in the same manner as Malak had. T. 621.

{¶ 6}  Omar and Joseph were the last to take a turn on the tube. T. 511, 624. Appellant wanted to drive. T. 511-512. While hesitant to do so, Malak let Appellant drive. T. 512.

{¶ 7} Meanwhile, two fishermen, Joseph Haig and Alex Kettler had been watching the men tubing. The group caught their attention because while Appellant was at the wheel, they watched him stop the boat, bringing the tube parallel to the boat, then accelerate quickly snapping the tube around to the back of the boat, and then make half circle turns back toward the tube. T. 456-459, 695-697. Haig thought the maneuvers looked risky. T. 459.

{¶ 8} Appellant towed Omar and Joseph for a couple minutes making some sharp turns. He then swung the boat to the right before quickly executing a sharp left turn, driving directly at Omar and Joseph. T. 515-16, 630, 800-801. Seconds later the boat struck both Omar and Joseph, sucking them under the boat, where they were both struck by the propeller. T. 515-516, 630.

{¶ 9} Malak turned off the boat motor and called 911. T.521, 803-804. Appellant and Yzen jumped into the water to help Omar and Joseph. T. 521. Yzen and Omar swam back to the boat. Omar sustained serious injury from the boat's propeller. T. 524.

{¶ 10} Haig and Kettler witnessed the collision and went to the aid of Joseph. T. 460-464. They pulled both Joseph and Appellant into their boat, noting Joseph was gravely injured and bleeding profusely. T. 463. Appellant was hysterical, "freaked out" and asked "if he had killed him." T. 465. Haig called the Department of Natural Resources and transported Appellant and Joseph to shore. Joseph was transported by ambulance to Grant Medical Center where he died as a result of his injuries. T. 902.

{¶ 11} Berlin Township Fire Department Captain Malachi Swanson responded to the scene. He drove the department rescue boat out to the stranded rental boat still occupied by Omar, Yzen, Malak, Miguel, and Amjad. Swanson first transported Omar to shore for medical attention, then returned to the rental boat. Swanson attempted to drive

the rental boat to shore, but the wheel was locked. He therefore towed the boat to the marina. T. 326-330.

{¶ 12} Ohio Department of Natural Resources Lieutenant Dawn Roberts took custody of the rental boat and transported it to a secure facility controlled by the ODNR. T. 391, 404. She took photos of the boat, the stern drive, and the propeller. T. 394. During the processing of the boat, ODNR investigators removed entangled fabric from the propeller which proved to be the swim trunks Joseph and Omar had worn, plus a strap from one of their life jackets. T. 408. ODNR investigator Heidi Hayes then investigated the wheel and stern drive and found both operated as intended. T. 932-933.

{¶ 13} As a result of these events, Appellant was charged with one count each of aggravated vehicular homicide, aggravated vehicular assault, reckless or unsafe operation of a vessel.

{¶ 14} Appellant pled not guilty to the charges and elected to proceed to a jury trial. Appellant blamed mechanical malfunction for the accident. Specifically, he alleged the steering on the boat malfunctioned. T. 259-260.

{¶ 15} At trial, Dr. Kort Gronbach testified on behalf of the state. Gronbach testified that the day before this incident, he and his family had rented the same ski boat that Appellant and his friends had rented the following day. He further testified his family had the boat for the entire day, used it for tubing, and experienced no issues with the boat's steering. T. 277-280.

{¶ 16} Omar also testified for the state. He testified that August 3, 2020 was the first time he had been boating or tubing. He had met Appellant approximately two months prior. T. 849, 852. Omar characterized Malak as a "safe driver" of the boat who "didn't get

anywhere near the tubers." T. 860-861. Omar recalled Malak mentioning he felt the boat's steering was "weird." T. 861.

{¶ 17} Omar testified Amjad drove while Appellant and Malak took a turn on the tube. He described Amjad's driving as "rougher," "it was faster and he was like manipulating the steering much more." T. 862. Omar and Joseph then got on the tube. Before they did, Omar saw Amjad shorten the tow rope on the tube putting the tube closer to the boat. T. 864. Once the boat started "[i]mmediately they started going crazy * * * driving very rough * * * just like trying to do something. They just really driving really quickly and in all directions, so something was, was going to go wrong." T. 867. "They were doing stunts and weaves with the boat and we were like very hardly able to hang onto the tube." T. 869. On one pass the boat came very close to them as Appellant turned around. T. 871.

{¶ 18} Both Omar and Joseph were concerned. Joseph was screaming and telling them to stop. Then suddenly the tube was no longer moving and the boat was coming straight at them very fast. T. 868-869. The men never let go of the tube before being struck by the boat, pulled underneath, and struck by the propeller. Omar was struck by the propeller on his arms, legs and body. His swim trunks and part of his life vest were torn from his body. T. 872-873. Once he and Joseph surfaced, they were both screaming in pain and for help. T. 874-875. Eventually Omar and Joseph were removed from the lake and transported to a hospital. T. 876-877.

{¶ 19} Henry Lipian also testified on behalf of the state. Lipian is a senior crash reconstructionist with Introtech Crash Reconstruction and Forensics. Introtech investigates all types of transportation accidents including maritime accidents. T. 945-946. Lipian spent 31 years in the United States Coast Guard where he was a maritime

engineer and was involved in, among other things, boating accident investigation involving a wide array of watercraft. He spent 10 years on active duty and continued as a reserve guardsmen. Lipian also served as an Ohio State Highway Patrol Trooper as well as an officer at two other police departments. Lipian had investigated thousands of maritime accidents involving a wide range of watercraft. He had previously testified as an expert in boating accident reconstruction on at least 10 occasions. T. 947-954. Because he had performed maintenance and repair on similar boats on many occasions, Lipian was also very familiar with the rack and pinion steering system common in smaller recreational boats like the Bayliner he was asked to examine in this case. T. 950-952.

{¶ 20} Lipian examined the steering system of the Bayliner from the wheel to the all the way to the aft stern drive. He found three of the four bolts holding the Teleflex rack and pinon steering system in place were loose. Lipian opined that while ideally the bolts should be tight, the loose bolts would have no effect on steering the boat. T. 970-971. He stated that if the wheel were locked to the left or the right, the stern drive would also be in the same position. However, when the boat was removed from the water, the sterndrive was centered. Ultimately, Lipian found nothing which would cause the steering on the boat to lock. T. 1090-1095.

{¶ 21} Eric Brown testified for the defense. Brown is the owner of Crash Tech Reconstruction Services. He is a certified forensic vehicle inspector and completed course work covering rack and pinion steering systems. Brown previously served as a Marine where he was assigned to motor transport and responsible for operation of the motor vehicles or working in the motor pool on trucks and Humvees. Following the Marine Corp, Brown went to police academy and spent most of his law enforcement career with the Canton Police Department. He was assigned to the traffic unit as a traffic crash

investigator and received formal training in the same. While Brown had investigated over 2,500 crashes, only 25 involved watercraft and this case marked the first time he had testified as an expert in boating accident reconstruction. T. 1012-1020.

{¶ 22} Brown also performed a forensic examination of the Bayliner's steering system and observed the same loose bolts Lipian observed. Brown opined the loose bolts caused the Teleflex system to twist and lock in place just before the collision. Brown's opinion was also based on the statements of the men who drove the rental boat and said steering wheel was hard to turn, those that heard the men say so, and Berlin Township Fire Department Captain Swanson who stated the wheel of the boat was locked when he boarded to boat to rescue Omar. T. 1060-1062. The wheel did not lock during Brown's inspection. Instead the wheel required greater force to turn once it was turned completely in one direction. T. 1054-1055. Brown concluded, however, that mechanical failure was the proximate cause of the collision. T. 1043-1045.

{¶ 23} Lipian rejected Brown's finding that the rack and pinion system jammed due to lose bolts. He explained the rack unit was engaged with the pinion housing and there was good contact between the pinion and the rack gears. T. 1098.

{¶ 24} After hearing all the evidence and deliberating, the jury convicted Appellant as charged. Appellant was sentenced to a term of community control with various conditions, his driver's license was suspended for four years, and he was ordered to pay a fine and restitution.

{¶ 25} Appellant filed an appeal and the matter is now before this court for consideration. He raises one assignment of error as follows:

{¶ 26} "THE CONVICTIONS FOR AGGRAVATED VEHICULAR HOMICIDE AND VEHICULAR ASSAULT WERE NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE."

{¶ 27} In his sole assignment of error, Appellant argues his convictions for aggravated vehicular homicide and vehicular assault are against the manifest weight of the evidence. We disagree.

{¶ 28} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).  See also, *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."  *Martin* at 175.

{¶ 29} Appellant was convicted of aggravated vehicular homicide pursuant to R.C. 2903.06(A)(2)(a). That section provides in relevant part that no person, while operating a watercraft, shall recklessly cause the death of another. Appellant was also convicted of aggravated vehicular assault pursuant to R.C. 2903.08(A)(2)(b). That section provides in relevant part that no person while operating a watercraft, shall recklessly cause serious physical harm to another person.

{¶ 30} At trial Appellant did not dispute that Joseph died or that Omar suffered serious physical harm. The dispute instead focused on whether Appellant recklessly caused the death and injury. Appellant's argument remains the same here on appeal.

{¶ 31} R.C. 2901.22(C) defines the culpable state of recklessness. That section states:

> A person acts recklessly when with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, a person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

{¶ 32} The trial court instructed the jury on "cause" pursuant to Ohio Jury Instructions sections 417.23 and 414.25. The instruction defined case as:

> [A]n act or a failure to act that in a natural and continuous sequence directly produces a particular outcome and without which that outcome would not have occurred. The Defendant's responsibility is not limited to the immediate or most obvious result of his actions or his failure to act. He is also responsible for the natural and foreseeable consequences that follow, in the ordinary course of events, from his actions or failure to act.

{¶ 33} T. 1259.

{¶ 34} Appellant first discounts the testimony of Haig and Kettler as that of fishermen irritated by the appearance of the ski boat which disrupted their quiet day. He

further faults their testimony because neither could recall there were multiple drivers at the wheel of the Bayliner. We note, however, that neither Haig nor Kettler testified they were irritated by the appearance of the men in the ski boat. Rather, Kettler testified he was concerned when the ski boat passed them very closely. T. 677. Further, the jury could have reasonably concluded Haig and Kettler were merely bystanders with no motive to fabricate their testimony regarding Appellant's reckless operation of the boat. Moreover, whether or not Haig and Kettler were aware of multiple drivers was of no consequence as Appellant never disputed he was behind the wheel of the Bayliner when the collision took place.

{¶ 35} Appellant also discounts the testimony of Omar by arguing that the whole experience would have felt more dangerous to him because he did not have his glasses on, and further, because he got hurt, in hindsight the experience would seem more dangerous to him. But Omar never testified that not wearing his glasses had any impact on what he physically felt or his emotional state, only that he could not see who was driving the boat. T. 865. The jury was aware Omar sustained injury and aware he was not wearing his glasses. It was free to weigh his credibility accordingly.

{¶ 36} Appellant further argues Omar was not credible because his testimony conflicted in various ways with that of the rest of his friends. It is well settled, however, that that a jury is charged with resolving matters of credibility and conflicts in the evidence. In fact, the Supreme Court of Ohio recently reiterated that it is the jury's responsibility to "fairly * * * resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts" and that the "jury is the sole judge of a witness's credibility." (Citations omitted) *State v. Hundley*, 162 Ohio St.3d 509,

2020-Ohio-3775, 166 N.E.3d 1066 ¶ 59. Upon review of the record and find the jury "fairly" resolved these conflicts.

{¶ 37} Appellant's final arguments pertain to the conflicting conclusions of expert witnesses Lipian and Brown. The jury heard extensive testimony from each expert. Whether or not the steering malfunctioned was the focus of each expert's testimony. Lipian found nothing internal to the boat that would permit the steering wheel to lock, even though Captain Swanson stated he found the wheel "locked." Lipian noted that in fact, there was 15-20 degrees of play in the wheel in either direction. While Brown relied heavily on the statement of Swanson and the men who drove the boat, Lipian felt the restriction experienced by Swanson was caused by something external to the boat such as line/tow rope wrapped in the sterndrive or propeller. T. 1090. Swanson did not examine the boat, and neither expert could cause the steering on the Bayliner to seize or lock.

{¶ 38} While the testimony of the two experts reached different conclusions, as noted above, conflicts in testimony are a matter for the jury to sort out. We find nothing in the record to a support a conclusion that the jury lost its way in believing the state's expert over Appellant's. As also noted above, matters of credibility are also to be determined by the jury. The jury may well have assigned greater credibility to the state's expert over Appellant's due to Lipian's superior experience in the investigation of boat crashes or found his analysis more believable.

{¶ 39} Upon complete review of the record, we find it devoid of any indication that the jury lost its way in making its credibility determinations, resolving conflicts in evidence, and convicting Appellant of aggravated vehicular homicide and aggravated vehicular assault. Accordingly, we find Appellant's convictions are not against the manifest weight of the evidence and overrule the sole assignment of error.

{¶ 40} The judgment of the Delaware County Court of Common Pleas is affirmed.

By King, J.,

Hoffman, P.J. and

Baldwin, J. concur.

AJK/rw

[Cite as *State v. Habib*, 2023-Ohio-1338.]