[Cite as *State v. McCrary*, 2026-Ohio-1263.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-250240 |
| | | TRIAL NO. B-2103456-A |
| Plaintiff-Appellee, | : | |
| | | *JUDGMENT ENTRY* |
| vs. | : | |
| | | |
| SEANDELL MCCRARY, | : | |
| | | |
| Defendant-Appellant. | : | |

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed to plaintiff-appellee.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 4/8/2026 per order of the court.**

**By:**_____
      **Administrative Judge**

[Cite as *State v. McCrary*, 2026-Ohio-1263.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-250240 |
| | | TRIAL NO. B-2103456-A |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N* |
| vs. | : | |
| | | |
| SEANDELL MCCRARY, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: April 8, 2026

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Candace Crear,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Timothy J. McKenna*, for Defendant-Appellant.

**KINSLEY, Presiding Judge.**

{¶1} Following a jury trial at which he represented himself, defendant-appellant Seandell McCrary appeals from the trial court's judgment convicting him of drug trafficking and possession and sentencing him to 35-and-a-half years in prison. He asserts that the trial court failed to conduct a sufficient inquiry to ensure that he knowingly, intelligently, and voluntarily waived his right to counsel. He also contends that the State presented insufficient evidence to support his convictions, that the jury's guilty verdicts were against the manifest weight of the evidence, that the trial court erred in denying his motion to suppress, that cumulative error denied his right to a fair trial, and that the record does not support the trial court's imposition of consecutive sentences.

{¶2} Following our review of the record, we agree with McCrary that the trial court failed to engage in a colloquy that substantially complied with Crim.R. 44(A) before permitting him to represent himself at trial. But we disagree with McCrary's arguments as to the sufficiency of the evidence and the trial court's denial of his motion to suppress. We accordingly reverse McCrary's convictions and remand the cause for a new trial, at which the State may introduce evidence obtained as a result of McCrary's arrest.

*Factual and Procedural History*

{¶3} Following a series of undercover controlled drug exchanges involving a confidential informant, McCrary was arrested and indicted for a number of drug-related felonies. He was charged in Count 1 for trafficking in a fentanyl-related compound in violation of R.C. 2925.03(A)(1), a felony of the fifth degree; in Count 2 for trafficking in a fentanyl-related compound in violation of R.C. 2925.03(A)(2), a felony of the first degree; in Count 3 for possession of a fentanyl-related compound in

violation of R.C. 2925.11(A), a felony of the first degree; in Count 4 for trafficking in a fentanyl-related compound with a major drug offender ("MDO") specification in violation of R.C. 2925.03(A)(2), a felony of the first degree; and in Count 5 for possession of a fentanyl-related compound with an MDO specification in violation of R.C. 2925.11(A), a felony of the first degree.

{¶4} Count 1 related to conduct that occurred on July 2, 2021. Counts 2 through 5 related to conduct that took place on July 5, 2021. The State later dismissed Count 1, leaving Counts 2 through 5 for trial.

### A. Suppression Hearing

{¶5} McCrary filed a pretrial motion to suppress, arguing that his arrest was unsupported by probable cause and that all evidence discovered as a result should be excluded from trial.

{¶6} The trial court scheduled a hearing on McCrary's motion to suppress and a jury trial for the same day. At the beginning of the hearing, the State indicated that it had offered McCrary a five-year plea deal, which he rejected. In an effort to advance plea negotiations between the parties, the trial court summarized the potential penalties that McCrary could face if he were convicted of all the charges in the indictment. It advised McCrary that he could face between 14 and 20 years in prison. But this was incorrect. If convicted of all charges and sentenced to maximum consecutive terms in prison, McCrary actually faced a sentence of up to 35-and-a-half years—the high end of the indefinite sentence he ultimately received. Hearing the trial court's 14-to-20 year calculation, McCrary sought to continue the suppression hearing because he was dissatisfied with his attorney. The trial court rejected McCrary's request.

{¶7} The State then called Officer Mark Bode as its sole witness. Bode

testified that he was employed by the Cincinnati Police Department ("CPD") and had worked for over 18 years in drug enforcement. Bode became aware of McCrary through a confidential informant who had purchased fentanyl from "Raw." They discovered that "Raw" was McCrary through the vehicle McCrary used to conduct the drug sales. They also learned that McCrary had a history of State and federal drug convictions, so, beginning in May of 2021, they planned to stage a number of controlled drug transactions between the confidential informant and McCrary.

{¶8} According to Bode, one such exchange took place on July 1, 2021, when the confidential informant purchased drugs from McCrary at a Kroger grocery store in the Corryville neighborhood of Cincinnati. Officers observed the transaction as it took place. They noticed that McCrary had a large distinctive colored ponytail that sat on top of his head, making him easy to spot. McCrary also wore latex or rubber gloves, which made him stand out.

{¶9} The following day, July 2, 2021, McCrary again sold drugs to the confidential informant at a property located on West McMicken Street as officers watched. Leading up to the exchange, Bode monitored calls between the informant and McCrary by speaker phone.

{¶10} Per Bode's testimony, the police decided to arrest McCrary for the July 2, 2021 drug sale on July 5, 2021. They surveilled McCrary at a Comfort Suites hotel, where Bode observed McCrary engage in what was likely a hand-to-hand drug transaction in the hotel parking lot. McCrary then drove away. When he did, a team of officers arrested him. They searched his car and located a digital scale. They also found a hotel room key containing drug residue on his person. McCrary was transported to the Hamilton County Justice Center ("the justice center"), where he was strip searched and found to have a bag of fentanyl hidden near his genitalia.

{¶11} Bode believed McCrary used the hotel room to store additional drugs. Police accordingly used the hotel room key to enter the hotel. In doing so, they discovered the room was rented to a woman. They then sought and obtained a search warrant for McCrary's hotel room. The search uncovered approximately 150 grams of fentanyl, drug paraphernalia, and $30,000 cash.

{¶12} On cross-examination, Bode testified that police conducted about a dozen controlled drug buys with McCrary between May and June 2021. Bode admitted that the informant never wore a recording device and that no video or photos documented the transactions.

{¶13} Following the hearing, the trial court denied McCrary's motion to suppress. For reasons unrelated to this appeal, the judge who determined the motion to suppress transferred the matter to another judge.

### B. McCrary's Representation

{¶14} McCrary eventually terminated the attorney who represented him at the suppression hearing. That attorney was replaced with another lawyer, whom McCrary also terminated. In total, he was represented by four different attorneys over the course of the proceedings before the trial court.

{¶15} At an October 1, 2024 pretrial hearing, McCrary expressed that he wanted to represent himself. In response, the trial court indicated that McCrary had a constitutional right to a lawyer and suggested that things did not end well for another defendant who had recently represented himself. After this brief advisement and a nod from McCrary indicating that he wished to proceed without representation, the trial court declared that McCrary had waived his right to counsel.

{¶16} But McCrary quickly had second thoughts. At a January 8, 2025 hearing, McCrary indicated that he in fact wanted representation and asked for time

6

to hire an attorney. He also indicated that he had not received the discovery necessary to prepare for trial. The trial court continued the matter for two days to January 10, 2025. That day, the trial court continued the case again after McCrary represented that he had contacted several attorneys for assistance to no avail.

{¶17} On January 15, 2025, the trial court again inquired as to McCrary's efforts to find counsel. McCrary explained that he had been placed in solitary confinement after he was found in possession of a cell phone in jail. He therefore had limited access to phones and had been unable to find an attorney. Attributing these restrictions to McCrary's wrongdoing, the trial court set the matter for a jury trial.

### C. Trial

{¶18} On March 17, 2025, the charges against McCrary were tried to a jury. At the outset, McCrary asked for a lawyer. Expressing frustration, the trial court indicated that it had given McCrary ample time to find counsel and that McCrary had been difficult and disruptive. The trial court impaneled a jury.

{¶19} On March 18, 2025, the State called two witnesses, Officer Thomas Weigand and Detective Aubrey Pitts.

{¶20} Weigand, a Cincinnati police officer, testified that he had been involved with narcotics investigations for 75 percent of his 23-year career. Weigand explained the process of surveilling suspected drug traffickers. First, he indicated that CPD lacks the resources to record undercover drug transactions. Second, he explained what a hand-to-hand drug transaction is—a quick meet-up, where there is a quick exchange, and people quickly part ways.

{¶21} Weigand became aware of McCrary through a confidential informant who told officers about a person named "Raw." According to the informant, "Raw" was trafficking fentanyl in the area. Officers began an investigation by setting up

7

controlled drug transactions between "Raw" and the informant. The informant would make calls to McCrary, and McCrary would provide a location to meet. Officers would then observe the controlled exchanges. Eventually officers were able to identify "Raw" as McCrary. Weigand described that McCrary always wore latex gloves, which stood out to him.

{¶22} On July 5, 2021, officers conducted surveillance at a Comfort Suites hotel. They observed McCrary pull into the hotel parking lot in a rental car. McCrary went into the hotel for a short time, came outside, and engaged in a hand-to-hand drug transaction with a person in another car. Officers then followed McCrary out of the parking lot and radioed for uniformed officers to stop him. McCrary was arrested, his car was searched, and he was taken to jail. The car search yielded a hotel room key, a digital scale, a "little credit card thing" with drug residue, and personal papers.

{¶23} Officers then obtained a search warrant for the hotel room associated with the key that was recovered from McCrary's car. Inside the hotel room were fentanyl, drug paraphernalia, and cash.

{¶24} Pitts, a CPD officer assigned to the Gun Crime Task Force, participated in McCrary's July 5, 2021 arrest. The State played Pitts's body-worn camera ("BWC") footage, which was marked as State's Exhibit 11. After arresting McCrary, Pitts searched him for weapons or contraband, when he felt what he called a "little bump" near McCrary's genitals. The testimony then concluded for the day.

{¶25} The next day, March 19, 2025, McCrary once again asked for a lawyer and expressed his need for legal counsel.

{¶26} The State then called two additional witnesses, Deputy Eric Arroyo and Laura Kimble. Arroyo testified that he previously worked as a corrections officer performing intake at the justice center. Arroyo conducted a strip search of McCrary

8

during intake and located a bag of heroine between McCrary's penis and testicles. Arroyo identified State's Exhibit 9 as the bag he found in McCrary's groin.

{¶27} Laura Kimble, Chief Drug Analyst at the Hamilton County Crime Laboratory, tested items recovered from McCrary's car and the hotel room. She testified that the scale contained fentanyl and cocaine residue, the substances recovered from the hotel room totaled 143.934 grams of a fentanyl and xylazine mixture, the substances recovered from under McCrary's testicles at the jail totaled 21.155 grams of the same mixture, and the hotel room key contained residue of that mixture as well. Following Kimble's testimony, the State rested.

{¶28} On March 20, 2025, McCrary called two witnesses, Bode and Pitts. Bode reiterated the sequence of events leading to McCrary's arrest and testified that, based on his training and experience, the possession of large quantities of narcotics, significant cash, and distribution-related paraphernalia is consistent with drug trafficking. He further testified that it is common for drug traffickers to rent hotel rooms in another person's name, as McCrary did. In response to questions from McCrary, Bode denied planting the drugs.

{¶29} Pitts testified consistently with his prior testimony. McCrary did not testify.

{¶30} That same day, the jury returned guilty verdicts on all counts.[1]

{¶31} On April 10, 2025, the trial court sentenced McCrary to a total of 30 to 35-and-a-half years in prison. In doing so, the trial court merged Count 3 with Count 2 and Count 5 with Count 4. As to Count 2, McCrary was sentenced to 11 to 16-and-a-half years. As to Count 4, he was sentenced to 11 years, with an additional eight years

---

[1] The State dismissed Count 1. McCrary was convicted of Counts 2 through 5.

for the MDO specification. The trial court ordered all sentences to be served consecutively to one another. It awarded McCrary time-served credit of 621 days and ordered him to pay a $40,000 fine.

{¶32} McCrary now appeals.

## *Analysis*

{¶33} On appeal, McCrary asserts seven assignments of error. In his first assignment of error, he argues the trial court erred by failing to sufficiently warn him of the dangers of self-representation. In his second assignment of error, he argues the trial court erred by failing to ensure that he knowingly, intelligently, and voluntarily waived his right to counsel. In his third assignment of error, he argues that the State failed to present sufficient evidence to support his convictions. In his fourth assignment of error, he contends that his convictions were against the manifest weight of the evidence. In his fifth assignment of error, he argues that the trial court erred in denying the motion to suppress the automobile search. In his sixth assignment of error, he argues that cumulative error resulted in an unfair trial. And in his seventh assignment of error, he argues that the record does not support consecutive sentences.

### *A. Self-Representation*

{¶34} McCrary's first assignment of error argues that the trial court failed to adequately warn him of the dangers of self-representation before he represented himself at trial. His second assignment of error argues that he did not properly waive his right to counsel and was therefore deprived of his constitutional right to counsel under the United States and Ohio Constitutions. Because both of these arguments address the adequacy of the trial court's colloquy as to whether McCrary knowingly, intelligently, and voluntarily waived his right to counsel, we address them together.

{¶35} We review the propriety of a defendant's waiver of the right to counsel

de novo. *State v. Jackson*, 2019-Ohio-2933, ¶ 5 (1st Dist.).

**{¶36}** The right to counsel is guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution. *State v. Sherman*, 2023-Ohio-2142, ¶ 9 (1st Dist.). A person facing criminal charges also has the independent constitutional right to self-representation. *State v. Martin*, 2004-Ohio-5471, ¶ 23. This right is properly exercised by knowingly, intelligently, and voluntarily waiving the right to counsel. *State v. Furr*, 2018-Ohio-2205, ¶ 6 (1st Dist.). As such, the right to self-representation does not attach until it is affirmatively asserted. *State v. Hundley*, 2020-Ohio-3775, ¶ 103.

**{¶37}** Courts must "indulge in every reasonable presumption against waiver" of the right to counsel. *Id.*, citing *Brewer v. Williams*, 430 U.S. 387, 404 (1977). Accordingly, a strict standard applies when considering whether a defendant has invoked the right to self-representation. *Id.* Even where invoked, a defendant's unequivocal request to engage in self-representation can later be abandoned. *See State v. Brown*, 2018-Ohio-3674, ¶ 7 (8th Dist.).

**{¶38}** Relatedly, Crim.R. 44 sets forth the procedure by which a person accused of a crime may waive the right to counsel. In felony cases, the waiver must occur both in writing and in open court. *See* Crim.R. 44(A), (C). However, the requirement that the waiver be memorialized in writing is a not a constitutional one, and courts will therefore uphold waivers that take place in court so long as the trial court substantially complies with the requirements of Crim.R. 44(A). *Martin* at ¶ 38. "The failure to execute a written waiver is therefore harmless error where the trial court engages in a sufficient colloquy to determine whether the defendant fully understands and intelligently relinquishes the right to counsel." *State v. Wallace*, 2024-Ohio-4886, ¶ 26 (1st Dist.), citing *Martin* at ¶ 39.

**{¶39}** To substantially comply with Crim.R. 44(A), a trial court's in-court colloquy must make a sufficient inquiry to determine whether the accused fully understands and is intelligently relinquishing the right to counsel. *Furr*, 2018-Ohio-2205, at ¶ 8 (1st Dist.). The trial court should accordingly explain to the accused "the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all the other facts essential to a broad understanding of the whole matter." *Id.* at ¶ 9, citing *State v. Gibson*, 45 Ohio St.2d 366, 377 (1976). In addition, the trial court should indicate that the accused will be required to follow the same rules and procedures that ordinarily govern the conduct of a trial. *Id.*

**{¶40}** To fully ensure a defendant's knowledge and understanding of the right to counsel, a trial court should additionally review the dangers and disadvantages of self-representation with the defendant. *State v. Ott*, 2017-Ohio-521, ¶ 5 (9th Dist.). This is "so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta v. California*, 422 U.S. 806, 835 (1975).

**{¶41}** "Whether a defendant's choice was made with eyes open typically 'depend[s], in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *State v. Obermiller*, 2016-Ohio-1594, ¶ 30, quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). The failure to advise a defendant of the nature of the charges, the allowable penalties, and what possible defenses and mitigation might be available is a factor in determining whether the defendant sufficiently waived the right to counsel. *Ott* at ¶ 6. And whether a defendant did in fact voluntarily, intelligently, and knowingly waive the right to counsel is determined by the totality of the circumstances. *Hundley*,

2020-Ohio-3775, at ¶ 103.

**{¶42}** We consider first whether McCrary expressly and unequivocally invoked his right to self-representation. During a pretrial hearing, the following exchange occurred between McCrary and the trial court in which McCrary expressed the desire to represent himself:

COURT: Did you get an attorney?

DEFENDANT: No. I'm going pro se.

COURT: You are going pro se?

DEFENDANT: Uh-huh.

COURT: Okay. Do you understand you have an absolute right, Constitutional right actually to go pro se. Because I know about 35, 36 years ago there was a defendant that didn't want a lawyer and I did actually appoint him a lawyer. I think it is important. The Court of Appeals said that was wrong. So you have an absolute Constitutional right not to have a lawyer. You also, as you know, have an absolute right under the Constitution to have a lawyer. If you can't afford one, one will be provided free of charge. I have a public defender that I have in mind to appoint on this case if you can't afford one. And you know that, right? You have a right to have a lawyer.

DEFENDANT: Uh-huh.

COURT: And even though you know you have a right to have a lawyer you are choosing to waive that right; is that right? You want to go by yourself?

DEFENDANT: (Nodding.)

COURT: I advise you not to. I just had a guy in here today, ended up

getting the maximum consecutive sentences. He represented himself. And then last week there was another guy representing himself. He got the max consec. And about six weeks ago another guy represented himself, a Sovereign Citizen type case and, yeah, it didn't work out so well for him.

DEFENDANT: That ain't got nothing to do with me, though.

COURT: Oh, if you think you can do it, that's great. I had some defendants that didn't do too bad of a job. Okay. So let's set it for trial then.

**{¶43}** It is possible that McCrary's statement "I'm going pro se" was an unequivocal and express assertion of the right to self-representation. But we need not decide that definitive question, because even if McCrary affirmatively asserted his right to represent himself, he subsequently abandoned that assertion. Multiple times before the start of the March 17, 2025 jury trial, and again during the trial, McCrary plainly indicated that he wanted a lawyer to represent him. He described difficulties with the discovery process that an attorney could facilitate. He made clear that he no longer wished to represent himself before the jury. Thus, applying the strict standard that applies to invocation of the right to self-representation and the presumption against waiver of the right to counsel, we conclude that McCrary abandoned any efforts he may have made to "go[] pro se."

**{¶44}** We next address the question of whether McCrary knowingly, intelligently, and voluntarily waived his right to counsel. Here, McCrary did not sign a written waiver. Therefore, to determine whether McCrary sufficiently waived his right to counsel, we must determine whether the trial court engaged in a colloquy that substantially complied with Crim.R. 44(A). The record does not demonstrate that

14

such a colloquy took place. Instead, the trial court merely informed McCrary that he had the right to an attorney and that another person's efforts at self-representation did not end well.

**{¶45}** This conversation fell short of ensuring that McCrary knowingly, voluntarily, and intelligently waived his right to counsel. While the trial court did marginally discourage McCrary from "going pro se," it failed to inform him of the nature of the charges, the statutory offenses he was alleged to have committed, the range of possible punishments he was facing, and possible defenses an attorney might be able to raise for him at trial including mitigation. *See Martin*, 2004-Ohio-5471, at ¶ 40. Nor did it advise McCrary that, as a self-represented litigant, he would be held to the same procedural standards as a licensed attorney. *See Furr*, 2018-Ohio-2205, at ¶ 9 (1st Dist.). Without this information, it was impossible for McCrary to assess the decision to forego counsel "with eyes open." *See Faretta*, 422 U.S. at 835.

**{¶46}** What is more, the trial court also failed to ensure that McCrary adequately understood the consequences of his waiver. McCrary was never asked to verbally confirm his understanding of his rights or to affirmatively waive them out loud on the record. Making matters worse, the record reflects that McCrary was profoundly confused about the consequences of his waiver. At trial, he repeatedly indicated that he did not understand how to try his case. McCrary also told the trial court that he believed representing himself would make the judge "proud" of him.

**{¶47}** The State concedes that, at the time McCrary became unrepresented, the trial court did not review the potential charges, defenses, or range of punishments with him as required by Crim.R. 44(A). It argues, however, that this defect was remedied by the trial court's review of possible punishments at the suppression hearing. But there are several problems with this position. First, there was a nearly

15

year-and-a-half gap between the suppression hearing and McCrary's self-representation at trial. No effort was made at the time of McCrary's alleged waiver of counsel to determine whether he understood, or even remembered, what was said at the suppression hearing.

{¶48} Second, McCrary was represented by an attorney at the suppression hearing. Thus, even if he did recall the trial court's explanation of his charges and the possible sentencing range, he likely would not have considered that information in connection with the risks of self-representation because he had a lawyer at that time.

{¶49} Third, the trial court's calculation of McCrary's maximum possible sentence at the suppression hearing was incorrect. The trial court informed McCrary, in a somewhat confusing way, that it could sentence him to between 14 and 20 years in prison. McCrary ultimately received a 30-to-35-and-a-half-year sentence. The trial court therefore underestimated McCrary's maximum prison time by 15-and-a-half years.

{¶50} Fourth, the suppression hearing was conducted by a different trial court judge than the one who later permitted McCrary to waive his right to counsel. The suppression hearing was not transcribed until this appeal was filed, meaning that the trial judge who determined McCrary's waiver could not have known what was said. Thus, the subsequent trial court judge could not have factored the suppression hearing into his determination that McCrary's waiver was knowing, intelligent, and voluntary because he was not present for it and had no transcript to reflect what was expressed.

{¶51} Finally, even if we considered the suppression hearing in the context of McCrary's right to counsel, the trial court's explanation at that hearing still did not substantially comply with Crim.R. 44(A). The trial court did provide some basic information about McCrary's charges and a calculation of his maximum sentence,

albeit incorrect. But the trial court did not advise McCrary of the dangers of self-representation, the possible defenses and mitigation available to him, or the whole picture he faced without an attorney, as it was required to do. *See Furr*, 2018-Ohio-2205, at ¶ 9 (1st Dist.).

**{¶52}** Thus, considering the totality of the circumstances, the record is devoid of a colloquy that substantially complies with Crim.R. 44. As a result, McCrary did not knowingly, intelligently, and voluntarily waive his right to counsel. We accordingly sustain McCrary's first and second assignments of error and reverse the judgment of the trial court.

## B. *Sufficiency of Evidence*

**{¶53}** McCrary's third assignment of error argues that his convictions were based on insufficient evidence. We consider whether sufficient evidence supports McCrary's convictions for the purpose of determining whether he can be retried. *See State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). When reviewing a challenge to the sufficiency of evidence, the standard is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991).

**{¶54}** McCrary argues that the State failed to prove a number of essential elements related to his drug possession and trafficking convictions. But we disagree.

**{¶55}** With respect to Count 2, which alleged that McCrary knowingly prepared for shipment, shipped, transported, delivered, prepared for distribution, or distributed a controlled substance in an amount that exceeded 20 grams, McCrary contends that the State failed to prove evidence of trafficking. Count 2 related to the fentanyl found near McCrary's genitalia when he was strip searched at the justice

center. As to this substance, the State proved that it contained a mixture of fentanyl and xylazine that matched the larger batch of drugs found in the hotel room with a large amount of cash and drug paraphernalia. Bode testified that, based on his training and experience, individuals who sell drugs often carry only a portion of their supply to avoid losing their entire stash if they are arrested. Bode also testified that he observed McCrary engage in a hand-to-hand drug transaction in the hotel parking lot shortly before his arrest. Viewed in the light most favorable to the State, this evidence suggested that the fentanyl found on McCrary's body came from a larger supply of drugs that McCrary packaged for sale.

{¶56} With respect to Count 3, which alleged that McCrary possessed the fentanyl found near his testicles, McCrary argues that he was not in possession of the drugs at the justice center because officers did not locate drugs on his person during his arrest near the hotel. This is inaccurate. Pitts testified that he felt a "little bump" near McCrary's genital area when he patted him down for weapons during his arrest. And Arroyo testified that he conducted McCrary's strip search and located the fentanyl from under McCrary's testicles. The State also introduced the deputy's incident report and intake video footage to support the deputy's testimony. This evidence clearly supports McCrary's conviction for possession in Count 3.

{¶57} As to Counts 4 and 5, which pertain to the fentanyl found in the hotel room, McCrary argues that the State failed to prove that he constructively possessed the drugs. Relying on *State v. Devaughan*, 2020-Ohio-651 (1st Dist.), he points to the absence of forensic evidence linking him to the hotel and the fact that the hotel room was not registered in his name to suggest that the drugs were not his. But a person has constructive possession when he is able to exercise dominion and control over an item, even if he does not physically possess it. *State v. Hankerson*, 70 Ohio St.2d 87

18

(1982), syllabus, *overruled on other grounds by State v. Jenks*, 61 Ohio St.3d 259 (1991). Here, the evidence plainly demonstrated that McCrary had control over the items located in the hotel room. He was found in possession of the hotel room key when he was arrested shortly after driving away from the hotel parking lot. The key contained drug residue matching the fentanyl and xylazine mixture found inside the hotel room. When officers searched the hotel room, they found personal papers belonging to McCrary. And the substance hidden under McCrary's testicles also matched the unique drug mixture stored at the hotel. Considering this evidence in the light most favorable to the prosecution, the State presented sufficient evidence that McCrary possessed the fentanyl that was found at the hotel pursuant to a search warrant.

**{¶58}** We accordingly overrule McCrary's third assignment of error. Because sufficient evidence supported his convictions, McCrary may be retried on remand.

### C. Manifest Weight

**{¶59}** McCrary's fourth assignment of error contends that his convictions were against the manifest weight of the evidence. Our resolution of his first and second assignments of error renders this assignment of error moot, and we decline to address it.

### D. Motion to Suppress

**{¶60}** McCrary's fifth assignment of error contends that the trial court erred in denying his motion to suppress. We review a motion to suppress under a blended standard of review. *See In re J.T.*, 2023-Ohio-2695, ¶ 15-16 (1st Dist.). Under this standard, we accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* at ¶ 15. We then review de novo whether the facts meet the applicable legal standard. *Id.*

**{¶61}** McCrary raises a single argument in challenging the trial court's denial of his motion to suppress. He contends that police did not have probable cause to arrest him with a warrant and therefore lacked justification to search his car and hotel room, as these searches were incident to his arrest.

**{¶62}** In deciding whether there is probable cause for a warrantless arrest, we must determine "whether the facts and circumstances within an officer's knowledge were sufficient to warrant a prudent individual in believing that the defendant had committed or was committing an offense." *State v. Jordan*, 2020-Ohio-689, ¶ 11 (1st Dist.), citing *State v. Deters*, 128 Ohio App.3d 329, 333 (1st Dist. 1998). "The test for probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." (Cleaned up.) *State v. Thorton*, 2018-Ohio-2960, ¶ 21 (1st Dist.). Probable cause can arise when officers witness controlled drug transactions. *See, e.g., State v. Hovatter*, 2018-Ohio-2254, ¶ 17 (5th Dist.).

**{¶63}** The evidence presented at the suppression hearing clearly established that officers had sufficient probable cause to arrest McCrary on July 5, 2021. To this end, Bode testified that he observed McCrary conduct multiple controlled hand-to-hand drug transactions with a confidential informant over the span of two months, the last of which was three days before McCrary's arrest. Bode personally identified McCrary as the person who engaged in these transactions by his distinct hairstyle and the fact that he wore latex gloves. This evidence supplied probable cause for McCrary's arrest.

**{¶64}** We accordingly overrule appellant's fifth assignment of error. Evidence obtained as a result of McCrary's arrest may be admitted at McCrary's retrial.

### E. Cumulative Error and Sentencing

**{¶65}** McCrary's sixth and seventh assignments of error raise arguments

surrounding cumulative error and consecutive sentencing. Our resolution of McCrary's first and second assignments of error renders these assignments of error moot, and we decline to address them.

### *Conclusion*

**{¶66}** The trial court failed to substantially comply with Crim.R. 44 in permitting McCrary to waive his right to counsel at trial. But sufficient evidence supported McCrary's convictions for drug trafficking and possession, and the trial court correctly denied McCrary's motion to suppress, as his warrantless arrest was supported by probable cause. We accordingly affirm the judgment of the trial court insomuch as it denied McCrary's motion to suppress, but reverse the judgment in all other respects and remand the cause to the trial court for a new trial.

Judgment affirmed in part, reversed in part, and cause remanded.

**NESTOR** and **MOORE, JJ.,** concur.